## IN THE UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF WISCONSIN

|  |  |  |
|---|---|---|
| JANE DOE and JANE ROE, individually, and on behalf of all others similarly situated, | ) ) ) ) ) | |
| Plaintiffs, | ) ) | Case No. 24-cv-67-wmc |
| v. | ) ) ) | JURY TRIAL DEMANDED |
| PRAIRIE DU CHIEN MEMORIAL HOSPITAL ASSOCIATION, INC. d/b/a CROSSING RIVERS HEALTH, | ) ) ) ) | |
| Defendant. | ) | |

### AMENDED CLASS ACTION COMPLAINT AND JURY DEMAND

Plaintiffs, JANE DOE and JANE ROE, individually, and on behalf of all others similarly situated, (hereinafter "Plaintiffs") bring this Amended Class Action Complaint against Defendant, PRAIRIE DU CHIEN MEMORIAL HOSPITAL ASSOCIATION, INC. d/b/a CROSSING RIVERS HEALTH (hereinafter "CRH" or "Defendant"), and allege, upon personal knowledge as to their own actions, and upon information and belief as to all other matters, as follows.

### INTRODUCTION

1.     Plaintiffs bring this class action to address Defendant's improper practice of disclosing the confidential Personally Identifying Information ("PII")[1] and/or Protected Health Information ("PHI")[2] (collectively referred to as "Private Information") of Plaintiffs and the

---

[1] The Federal Trade Commission defines "identifying information" as "any name or number that may be used, alone or in conjunction with any other information, to identify a specific person," including, among other things, "[n]ame, Social Security number, date of birth, official State or government issued driver's license or identification number, alien registration number, government passport number, employer or taxpayer identification number." 17 C.F.R. § 248.201(b)(8).

[2] Under the Health Insurance Portability and Accountability Act, 42 U.S.C. § 1320d *et seq.*, and its implementing regulations ("HIPAA"), "protected health information" is defined as individually identifiable information relating to the past, present, or future health status of an individual that is created,

proposed Class Members to third parties, including Meta Platforms, Inc. d/b/a Meta ("Facebook" or "Meta"),[3] Google, LLC ("Google"), Simplifi, DoubleClick, CrazyEgg, and potentially others ("the Disclosure") via tracking technologies used on its website.

2.     The Office for Civil Rights ("OCR") at the U.S. Department of Health and Human Services ("HHS") and the Federal Trade Commission ("FTC") warn about the "serious privacy and security risks related to the use of online tracking technologies" present on websites or online platforms, such as Defendant's, that "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[4] OCR and FTC agree that such tracking technologies, like those present on Defendant's website, "can track a user's online activities" and "gather identifiable information about users as they interact with a website or mobile app, often in ways which are not avoidable by and largely unknown to users."[5] OCR and FTC warn that "[i]mpermissible disclosures of an individual's personal health information to third parties may result in a wide range of harms to an individual or others. Such disclosures can reveal sensitive information including health conditions, diagnoses, medications, medical treatments, frequency of visits to health care professionals, where an individual seeks medical treatment, and more. In addition,

---

collected, or transmitted, or maintained by a HIPAA-covered entity in relation to the provision of healthcare, payment for healthcare services, or use in healthcare operations. 45 C.F.R. § 160.103 *Protected health information*. "Business Health information such as diagnoses, treatment information, medical test results, and prescription information are considered protected health information under HIPAA, as are national identification numbers and demographic information such as birth dates, gender, ethnicity, and contact and emergency contact information. *Summary of the HIPAA Privacy Rule*, DEP'T FOR HEALTH & HUM. SERVS., https://www.hhs.gov/hipaa/for-professionals/privacy/laws-regulations/index.html (last accessed Apr. 16, 2020).  CRH is clearly a "covered entity" and some of the data compromised in the Disclosure that this action arises out of is "protected health information," subject to HIPAA.

[3] Facebook changed its name from Facebook, Inc. to Meta Platforms, Inc. in October 2021. Plaintiffs' reference to both "Facebook" and "Meta" throughout this complaint refer to the same company.

[4] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.

[5] *Id.*

impermissible disclosures of personal health information may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to others."[6]

3.    Information about a person's physical and mental health is among the most confidential and sensitive information in our society, and the mishandling of medical information can have serious consequences, including discrimination in the workplace or denial of insurance coverage. If people do not trust that their medical information will be kept private, they may be less likely to seek medical treatment, which can lead to more serious health problems down the road. In addition, protecting medical information and making sure it is kept confidential and not disclosed to anyone other than the person's medical provider is necessary to maintain public trust in the healthcare system as a whole.

4.    Recognizing these facts, and in order to implement requirements of the Health Insurance Portability and Accountability Act of 1996 ("HIPAA"), HHS has established "Standards for Privacy of Individually Identifiable Health Information" (also known as the "Privacy Rule") governing how health care providers must safeguard and protect Private Information. Under the HIPAA Privacy Rule, no health care provider may disclose a person's personally identifiable protected health information to a third party without express written authorization.

5.    CRH is a health care network located in Prairie du Chien, Wisconsin. It operates a "25-bed Critical Access Hospital" as well as a "state-of the-art Medical Center and two primary care clinics"[7] and offers "[m]ore than 100 services," ranging "[f]rom scrapes and breaks to

---

[6] Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **attached as Exhibit A.**
[7] About Us, CRH, https://www.crossingrivers.org/about-us/ (last visited Nov. 30, 2023).

preventative care."[8]

6.    Despite its unique position as a trusted healthcare provider, CRH knowingly configured and implemented into its website, https://www.crossingrivers.org/, (the "Website") code-based tracking devices known as "trackers" or "tracking technologies," which collected and transmitted Plaintiffs' and Class Members' Private Information to Facebook, Google, and other third parties, without their knowledge or authorization.

7.    Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to search for a doctor,[9] find treatment locations,[10] research health conditions and treatment options,[11] request an appointment,[12] access the patient portal,[13] sign up for classes and support groups,[14] and more.

8.    When Plaintiffs and Class Members used Defendant's Website and Online Platforms, they thought they were communicating exclusively with their trusted healthcare provider. Unbeknownst to them, Defendant embedded tracking technologies from Facebook, Simplifi, DoubleClick, and CrazyEgg into its Website and Online Platforms, surreptitiously forcing Plaintiffs and Class Members to transmit intimate details about their medical treatment to third parties without their consent.

9.    Facebook's tracker is called the Meta Pixel (also referred to as the "Pixel"). The

---

[8] Services, CRH, https://www.crossingrivers.org/services/ (last visited Nov. 30, 2023).
[9] Provider Directory, CRH, https://www.crossingrivers.org/providers/?specialty=Primary%20Care (Nov. 30, 2023).
[10] Locations, CRH, https://www.crossingrivers.org/locations/ (last visited Nov. 30, 2023).
[11] Services, CRH, https://www.crossingrivers.org/services/ (last visited Nov. 30, 2023).
[12] Request an Appointment, CRH, https://www.crossingrivers.org/forms/request-an-appointment/ (last visited Nov. 29, 2023).
[13] MyChart - Patient Portal, CRH, https://www.crossingrivers.org/patients-and-visitors/mychart-patient-portal/ (last visited Nov. 30, 2023).
[14] E.g., Infant Loss Support Group, CRH, https://www.crossingrivers.org/classes-and-events/events/infant-loss-support-group/?calendardate=20231205183000 (last visited Nov. 30, 2023).

Meta Pixel is a snippet of code, embedded into a website, that tracks information about its visitors and their website interactions.[15] As a visitor uses the website, the Meta Pixel records any "events" it is configured to track, such as pages viewed, buttons clicked, and information submitted.[16] Then, the Pixel transmits the event information back to the website server and to Facebook, where it can be combined with other data and used for marketing.[17]

10.     By default, the Meta Pixel tracks information about a website user's device and the URLs and domains they visit.[18] When configured to do so, the Meta Pixel can track much more, including a visitor's search terms, button clicks, and form submissions.[19] Additionally, the Meta Pixel can link a visitor's website interactions with an individual's unique and persistent Facebook ID ("FID"), allowing a user's health information to be linked with their Facebook profile.[20]

11.     Operating as designed and as implemented by Defendant, the Meta Pixel allowed Defendant to unlawfully disclose Plaintiffs and Class Members' private health information, alongside identifying details to Facebook. By installing the Meta Pixel on its Website, Defendant effectively planted a bug on Plaintiffs' and Class Members' web browsers and compelled them to disclose Private Information and confidential communications to Facebook without their authorization or knowledge.

---

[15] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[16] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[17] *Id.*
[18] *See* Get Started, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/get-started (last visited May 22, 2023).
[19] *See* Conversion Tracking, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/implementation/conversion-tracking (last visited May 22, 2023).
[20] The Meta Pixel forces the website user to share the user's FID for easy tracking via the "cookie" Facebook stores every time someone accesses their Facebook account from the same web browser. "Cookies are small files of information that a web server generates and sends to a web browser." "Cookies help inform websites about the user, enabling the websites to personalize the user experience." What are Cookies?, https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

12.     Facebook encourages and recommends that website owners who use the Metal Pixel also employ a Business Tool called Conversions Application Programming Interface ("CAPI").[21]

13.     Unlike the Meta Pixel, which co-opts a website user's browser and forces it to transmit information to Facebook, CAPI does not cause the user's browser to transmit information directly to Facebook. Instead, CAPI tracks the user's website interactions from the website owner's private servers, which transmits the data directly to Facebook, without involvement from the website user's browser.[22, 23]

14.     Because CAPI is located on the website owner's servers and is not a bug planted onto the website user's browser, it allows website owners like Defendant to circumvent any ad blockers or other denials of consent by the website user that would prevent the Meta Pixel from sending website users' Private Information to Facebook directly. For this reason, Facebook markets CAPI as a "better measure [of] ad performance and attribution across your customer's full journey, from discovery to conversion. This helps you better understand how digital advertising impacts both online and offline results."[24]

15.     Defendant utilized data from these trackers to market its services and bolster its profits. Facebook utilizes data from the Meta Pixel and CAPI to build data profiles for the purpose

---

[21] "CAPI works with your Meta Pixel to help improve the performance and measurement of your Facebook ad campaigns." *See* Samir El Kamouny, How to Implement Facebook Conversions API (In Shopify), FETCH & FUNNEL https://www.fetchfunnel.com/how-to-implement-facebook-conversions-api-in-shopify/ (last visited Jan. 25, 2023).
[22] What is the Facebook Conversion API and How to Use It, REVEALBOT BLOG, https://revealbot.com/blog/facebook-conversions-api/ (last updated May 20, 2022).
[23] "Server events are linked to a dataset ID and are processed like events sent via the Meta Pixel…. This means that server events may be used in measurement, reporting, or optimization in a similar way as other connection channels." Conversions API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/conversions-api (last visited May 15, 2023).
[24] About Conversions API, META FOR DEVELOPERS, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

of creating targeted online advertisements and enhanced marketing services, which it sells for profit.

16.     The information that Defendants' Meta Pixel and possibly CAPI sent to Facebook included Private Information that Plaintiffs and Class Members submitted to Defendants' Website, including Plaintiffs' and Class Members' (1) status as medical patients; (2) health conditions; (3) desired medical treatment or therapies; (4) appointment requests; (5) desired locations or facilities where treatment was sought; and (6) phrases and search queries (such as searches for symptoms, treatment options, or types of providers) conducted via the general search bar.

17.     Such information allows third parties (e.g., Facebook) to learn about a particular individual's health conditions and seeking of medical care. Facebook, in turn, sells Plaintiffs' and Class Members' Private Information to third-party marketers, who then target Plaintiffs and Class Members with online advertisements, based on the information they communicated to Defendant via the Website. Facebook and any third-party purchasers of Plaintiffs' and Class Members' Private Information also could reasonably infer from the data that a specific patient was being treated for a specific type of medical condition, such as cancer, pregnancy, dementia, or HIV.

18.     In addition to the Facebook tracker, and likely CAPI, Defendant installed other tracking technologies, including Google Analytics, Simplifi, DoubleClick, and CrazyEgg. On information and belief, these trackers operate similarly to the Meta Pixel and transmitted Plaintiffs and Class Members' Private Information to unauthorized third parties.

19.     Healthcare patients simply do not anticipate that their trusted healthcare provider will send their private health information to a hidden third party—let alone Facebook, a company with a sordid history of violating consumer privacy in pursuit of ever-increasing advertising revenue—without their consent.

20.     Neither Plaintiffs nor any Class Member signed a written authorization permitting Defendant to send their Private Information to Facebook, Google, Simplifi, DoubleClick, and CrazyEgg, or any other third parties uninvolved in their treatment.

21.     Despite willfully and intentionally incorporating the Meta Pixel, potentially CAPI, and other third-party trackers into its Website and servers, CRH did not disclose to Plaintiffs or Class Members that it was sharing their sensitive and confidential communications and Private Information with third parties including Facebook, Google, Simplifi, DoubleClick, and CrazyEgg.

22.     Defendant further made express and implied promises to protect Plaintiffs and Class Members' Private Information and maintain the privacy and confidentiality of communications that patients exchanged with Defendant, including in its privacy policies and elsewhere.

23.     Defendant owed common law, statutory, and regulatory duties to keep Plaintiffs' and Class Members' communications and Private Information safe, secure, and confidential.

24.     Upon information and belief, CRH utilized the Meta Pixel and other tracker data to improve and to save costs on its marketing campaigns, improve its data analytics, attract new patients, and generate sales.

25.     Furthermore, by obtaining, collecting, using, and deriving a benefit from Plaintiffs' and Class Members' Private Information, Defendant assumed legal and equitable duties to those individuals to protect and to safeguard their information from unauthorized disclosure.

26.     Defendant breached its statutory and common law obligations to Plaintiffs and Class Members by, *inter alia*, (i) failing to adequately review its marketing programs and web-based technology to ensure its Website was safe and secure; (ii) failing to remove or disengage technology that was known and designed to share web-users' information; (iii) aiding, agreeing,

and conspiring with third parties to intercept communications sent and received by Plaintiffs and Class Members; (iv) failing to obtain the written consent of Plaintiffs and Class Members to disclose their Private Information to Facebook, Google, Simplifi, DoubleClick, and CrazyEgg; (v) failing to protect Private Information and take steps to block the transmission of Plaintiffs' and Class Members' Private Information through the use of Meta Pixel and other tracking technology; (vi) failing to warn Plaintiffs and Class Members; and (vii) otherwise failing to design and monitor its Website to maintain the confidentiality and integrity of patient Private Information.

27.     As a result of Defendants' conduct, Plaintiffs and Class Members have suffered numerous injuries, including: (i) invasion of privacy; (ii) loss of benefit of the bargain; (iii) diminution of value of the Private Information; (iv) statutory damages; and (v) the continued and ongoing risk to their Private Information.

28.     Plaintiffs seeks to remedy these harms and bring causes of action for (I) Negligence; (II) Negligence *Per Se*; (III) Invasion of Privacy, Wis. Stat. § 995.50; (IV) Breach of Implied Contract; (V) Unjust Enrichment; (VI) Breach of Fiduciary Duty; (VII) Misrepresentation; (VIII) Conversion; (IX) Violation of the Wisconsin Deceptive Trade Practices Act, Wis. Stat. § 100.18; (X) Interception and Disclosure of Wire, Electronic, or Oral Communications, Wis. Stat. § 968.31; and (XI) Violation of Confidentiality of Patient Health Care Records Law, Wis. Stat. § 146.82.

## PARTIES

29.     Plaintiff JANE DOE is a natural person and a resident and citizen of Wisconsin, where she intends to remain, with a principal residence in Prairie du Chien in Crawford County. She is a patient of CRH and a victim of Defendant's unauthorized Disclosure of Private Information.

30.     Plaintiff JANE ROE is a natural person and a resident and citizen of Wisconsin,

where she intends to remain, with a principal residence in Prairie du Chien in Crawford County. She is a patient of CRH and a victim of Defendant's unauthorized Disclosure of Private Information.

31.    Defendant, PRAIRIE DU CHIEN MEMORIAL HOSPITAL ASSOCIATION, INC. d/b/a CROSSING RIVERS HEALTH ("CRH" or "Defendant"), is a non-stock corporation organized and existing under the laws of the State of Wisconsin with its principal place of business at 37868 U.S. Highway 18, Prairie du Chien, Wisconsin 53821 in Crawford County.

## COMMON FACTUAL ALLEGATIONS

### A. Background

32.    CRH is a health care network located in Prairie du Chien, Wisconsin. It operates a "25-bed Critical Access Hospital" as well as a "state-of-the-art Medical Center and two primary care clinics"[25] and offers "[m]ore than 100 services," ranging "[f]rom scrapes and breaks to preventative care."[26]

33.    Defendant encourages patients to use its Website, along with its various web-based tools and services (collectively, the "Online Platforms"), to search for a doctor,[27] find treatment locations,[28] research health conditions and treatment options,[29] request an appointment,[30] access the patient portal,[31] sign up for classes and support groups,[32] and more.

---

[25] About Us, CRH, https://www.crossingrivers.org/about-us/ (last visited Nov. 30, 2023).

[26] Services, CRH, https://www.crossingrivers.org/services/ (last visited Nov. 30, 2023).

[27] Provider Directory, CRH, https://www.crossingrivers.org/providers/?specialty=Primary%20Care (Nov. 30, 2023).

[28] Locations, CRH, https://www.crossingrivers.org/locations/ (last visited Nov. 30, 2023).

[29] Services, CRH, https://www.crossingrivers.org/services/ (last visited Nov. 30, 2023).

[30] Request an Appointment, CRH, https://www.crossingrivers.org/forms/request-an-appointment/ (last visited Nov. 29, 2023).

[31] MyChart - Patient Portal, CRH, https://www.crossingrivers.org/patients-and-visitors/mychart-patient-portal/ (last visited Nov. 30, 2023).

[32] E.g., Infant Loss Support Group, CRH, https://www.crossingrivers.org/classes-and-events/events/infant-loss-support-group/?calendardate=20231205183000 (last visited Nov. 30, 2023).

34.     To enhance its marketing efforts and increase profits, Defendant purposely installed the Meta Pixel and other trackers onto its Website to gather Private Information about Plaintiffs and Class Members. But Defendant did not only generate information for its own use: it also shared patient Private Information, including that belonging to Plaintiffs and Class Members, with Facebook, Simplifi, DoubleClick, and CrazyEgg, and potentially other unauthorized third parties.

35.     To better understand Defendant's unlawful data-sharing practices, a brief discussion of basic web design and tracking tools follows.

### i.     *Facebook's Business Tools and the Meta Pixel*

36.     Facebook operates the world's largest social media company and generated $117 billion in revenue in 2021, roughly 97% of which was derived from selling advertising space.[33]

37.     In conjunction with its advertising business, Facebook encourages website owners like Defendant to use its "Business Tools" to gather customer data, identify customers and potential customers, and market products and services.

38.     Facebook's Business Tools, including the Meta Pixel and Conversions API, are bits of code that advertisers can integrate into their webpages, mobile applications, and servers, thereby enabling the interception and collection of user activity on those platforms.

39.     The Business Tools are automatically configured to capture "Standard Events" such as when a user visits a particular webpage, clicks a button, fills out a form, and more.[34] Businesses

---

[33] Meta Reports Fourth Quarter and Full Year 2021 Results, FACEBOOK  https://investor.fb.com/investor-news/press-release-details/2022/Meta-Reports-Fourth-Quarter-and-Full-Year-2021-Results/default.aspx (last visited Nov. 14, 2022).
[34] Specifications for Facebook Pixel Standard Events, META, https://www.facebook.com/business/help/402791146561655 (last visited Jan. 31, 2023); *see also* Facebook Pixel, Accurate Event Tracking, Advanced, META FOR DEVELOPERS; https://developers.facebook.com/docs/facebook-pixel/advanced/; *see also* Best Practices for Facebook Pixel Setup, META https://www.facebook.com/business/help/218844828315224; App Events API, META FOR DEVELOPERS, https://developers.facebook.com/docs/marketing-api/app-event-api/ (last visited Jan. 31, 2023).

that want to target customers and advertise their services can also create their own tracking parameters by building a "custom event."[35]

40.    One such Business Tool is the Meta Pixel, a tool that "tracks the people and type of actions they take."[36] When an individual accesses a webpage that is hosting the Meta Pixel, the communications with the host webpage are instantaneously and surreptitiously duplicated and sent to Facebook—traveling directly from the user's browser to Facebook's server, based off instructions from the Meta Pixel.

41.    Notably, this transmission only occurs on webpages that contain the Pixel. A website owner can configure its website to use the Pixel on certain webpages that don't implicate patient privacy, such as a homepage, and disable it on pages that do implicate patient privacy.

42.    The Meta Pixel's primary purpose is to enhance online marketing, improve online ad targeting, and generate sales.[37].

43.    Facebook's own website informs companies that "[t]he Meta Pixel is a piece of code that you put on your website that allows you to measure the effectiveness of your advertising by understanding the actions people take on your website."[38]

44.    According to Facebook, the Meta Pixel can collect the following data.

**Http Headers** – Anything present in HTTP headers. HTTP Headers are a standard web protocol sent between any browser request and any server on the internet. HTTP Headers include IP addresses, information about the web browser, page location, document, referrer and ***person using the website.*** [Emphasis added.]

**Pixel-specific Data** – Includes Pixel ID and the Facebook Cookie.

---

[35] About Standard and Custom Website Events, META,
https://www.facebook.com/business/help/964258670337005; *see also* Facebook, App Events API, *supra*.
[36] Retargeting, META, https://www.facebook.com/business/goals/retargeting.
[37] *See* Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[38] About Meta Pixel, META,
https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

**Button Click Data** – Includes any buttons clicked by site visitors, the labels those buttons and any pages visited as a result of the button clicks.

**Optional Values** – Developers and marketers can optionally choose to send additional information about the visit through Custom Data events. Example custom data events are conversion value, page type and more.

**Form Field Names** – Includes website field names like email, address, quantity, etc., for when you purchase a product or service. We don't capture field values unless you include them as part of Advanced Matching or optional values.[39]

45.    Facebook boasts to its prospective users that the Meta Pixel can be used to:

- **Make sure your ads are shown to the right people.** Find new customers, or people who have visited a specific page or taken a desired action on your website.

- **Drive more sales**. Set up automatic bidding to reach people who are more likely to take an action you care about, like making a purchase.

- **Measure the results of your ads.** Better understand the impact of your ads by measuring what happens when people see them.[40]

46.    Facebook likewise benefits from Meta Pixel data and uses it to enhance its own ad targeting abilities.

    *ii.    Defendant's method of transmitting Plaintiffs' and Class Members' Private Information via the Meta Pixel and/or Conversions API i.e., the Interplay between HTTP Requests and Responses, Source Code, and the Meta Pixel*

47.    Web browsers are software applications that allow consumers to navigate the internet and view and exchange electronic information and communications. Each "client device" (such as computer, tablet, or smart phone) accesses web content through a web browser (e.g., Google's Chrome browser, Mozilla's Firefox browser, Apple's Safari browser, and Microsoft's Edge browser).

---

[39] Meta Pixel, META FOR DEVELOPERS, https://developers.facebook.com/docs/meta-pixel/ (last accessed Mar. 19, 2023).
[40] About Meta Pixel, META, https://www.facebook.com/business/help/742478679120153 (last accessed Mar. 19, 2023).

48.     Every website is hosted by a computer "server" that holds the website's contents and through which the website owner exchanges files or communications with Internet users' client devices via their web browsers.

49.     Web communications consist of HTTP Requests and HTTP Responses, and any given browsing session may consist of thousands of individual HTTP Requests and HTTP Responses, along with corresponding cookies.[41]

50.     GET Requests are one of the most common types of HTTP Requests.  In addition to specifying a particular URL (i.e., web address), they also send the host server data, which is embedded inside the URL and can include cookies.

51.     When an individual visits a website, their web browser sends an HTTP Request to the entity's servers that essentially asks the website to retrieve certain information. The entity's servers send the HTTP Response, which contains the requested information in the form of "Markup." This is the foundation for the pages, images, words, buttons, and other features that appear on the patient's screen as they navigate a website.

52.     Every website is comprised of Markup and "Source Code." Source Code is simply a set of instructions that commands the website visitor's browser to take certain actions when the web page first loads or when a specified event triggers the code.

53.     Source code may also command a web browser to send data transmissions to third parties in the form of HTTP Requests quietly executed in the background without notifying the web browser's user.

54.     In this way, the Meta Pixel acts much like a traditional wiretap, intercepting and

---

[41]"Cookies are small files of information that a web server generates and sends to a web browser . . . . Cookies help inform websites about the user, enabling the websites to personalize the user experience." https://www.cloudflare.com/learning/privacy/what-are-cookies/ (last visited Jan. 27, 2023).

transmitting communications intended only for the website host and diverting them to Facebook.

55.     Separate from the Meta Pixel, Facebook and other third parties place cookies in the web browsers of users who visit their websites or online platforms. These cookies can uniquely identify the user, allowing the third party to track the user as they browse the internet—on the third-party site and beyond. Facebook uses its own cookie to identify users of a Meta-Pixel-enabled website and connect their activities on that site to their individual identity. As a result, when a Facebook account holder uses a website with the Meta Pixel, the account holder's unique Facebook ID is sent to Facebook, along with the intercepted communication, allowing Facebook to identify the user associated with the information it has intercepted.

56.     With substantial work and technical know-how, internet users can sometimes circumvent these browser-based wiretap technologies. To counteract this, third parties bent on gathering data implement workarounds that are difficult for web users to detect or evade. Facebook's workaround is Conversions API, which "is designed to create a direct connection between [web hosts'] marketing data and [Facebook]."[42] This makes Conversions API a particularly effective tool because it allows sends Facebook data directly from the website server to Facebook, without relying on the user's web browser. Notably, client devices do not have access to host servers containing Conversions API, and thus, they cannot prevent (or even detect) this transmission of information to Facebook.

57.     While there is no way to confirm with certainty that a website owner is using Conversions API without accessing the website server, Facebook instructs companies like Defendant to "[u]se the Conversions API in addition to the Meta Pixel, and share the same events using both tools," because such a "redundant event setup" allows the entity "to share website

---

[42] *About Conversions API*, META, https://www.facebook.com/business/help/2041148702652965 (last visited May 15, 2023).

events [with Facebook] that the pixel may lose."[43]  Consequently, if a website owner utilizes the Meta Pixel on its website, it is also reasonable to infer that it implemented the Conversions API on its website server(s), in accordance with Facebook's documentation.

58.     The Meta Pixel, Conversions API, and other third-party trackers do not provide any substantive content on the host website. Rather, their only purpose is to collect information to be used for marketing and sales purposes.

59.     Accordingly, without any knowledge, authorization, or action by a user, a website owner can use its website source code to commandeer its users' computing devices and web browsers, causing them to invisibly re-direct the users' communications to Facebook, Google, or others.

60.     In this case, Defendant employed the Meta Pixel and potentially Conversions API to intercept, duplicate, and re-direct Plaintiffs' and Class Members' Private Information to Facebook contemporaneously, invisibly, and without the patient's knowledge.

61.     CRH also employed trackers from Simplifi, DoubleClick, and CrazyEgg. On information and belief, Defendant likewise transmitted Plaintiffs' and the Class Members' Private Information to these third parties without Plaintiffs' and Class Members' knowledge or authorization.

### iii.     Defendant's Privacy Policies Prohibit the Use and Disclosure of Private Information without Authorization

62.     CRH is covered under the Notice of Privacy Practices ("Privacy Policy") that is posted and maintained on Defendant's Website.[44]

---

[43] *See* Best Practices for Conversions API, META,
https://www.facebook.com/business/help/308855623839366 (last visited May 15, 2023).
[44] Notice of Privacy Practices, CRH,
https://www.crossingrivers.org/media/p/14707/noticeofprivacypractice_feb2020.pdf (last visited Nov. 30, 2023), **attached as Exhibit B.**

63.    On information and belief, Defendants do not maintain a separate Website privacy policy.

64.    According to Defendant, the Privacy Policy "describes how your medical information may be used and disclosed and how you can get access to your information."[45]

65.    In the Privacy Policy, CRH promises that it "will maintain the privacy of your personal health information (PHI). This Notice of Privacy Practice describes our legal duties and privacy practices concerning your personal health information."[46]

66.    Therein, CRH further acknowledges, represents and promises that "[i]n general, when we release your health information, we release information only for treatment, payment, and health care operations."

67.    Under the section heading "Marketing," CRH represents that "[u]nless you object, we may use your health information to inform you of products or services that we believe may be of interest to you. For example, we might contact patients receiving cancer treatment to notify them of the availability of an innovative treatment."[47]

68.    The Privacy Policy goes on to state that "[e]xcept for the situations listed above, we must obtain your specific written authorization for any other use or disclosure of your health information. **This includes marketing activities conducted by third parties or where a third party seeks to purchase protected health information.**"[48]

69.    CRH further represents and promises that "[i]f there should be a breach of data security and your personal health information is stolen, we will notify you by letter containing

---

[45] *Id.*
[46] *Id.*
[47] *Id.*
[48] *Id.* (emphasis added).

details of the breach in a timely manner."[49]

### iv. *Defendant Disclosed Plaintiffs and Class Members' Private Information, in Violation of its Own Privacy Policies*

70.    Despite the representations in its Privacy Policy, Defendant did, in fact, disclose Private Information to unauthorized third parties and for impermissible purposes. Through its use of the Meta Pixel, CRM disclosed to Facebook Plaintiffs' and Class Members' Private Information, by reporting the pages they visited, the content they viewed, the terms they searched, and the buttons they clicked.

71.    The Meta Pixel was present on Defendant's Website from at least July 15, 2016, to June 2, 2023.

72.    As soon as Plaintiffs and Class Members loaded the Website, Defendant's Meta Pixel began tracking and sending reports of their activities to Facebook. Upon a patient's arrival on CRH's homepage, CRH immediately sent a pair of PageView and Microdata events revealing the patient was on the webpage, "https://www.crossingrivers.org/" and learning about "Crossing Rivers Health in Prairie du Chien, Wisconsin."As the patient navigated beyond the homepage, CRH continued to track the patient's activities and disclose details about those activities to Facebook through PageView, Microdata, and SubscribedButtonClick events. By logging these events and sharing them with Facebook, CRH disclosed its patients' (i) keyword searches; (ii) physician and service search activities; (iii) appointment and booking activities; (iv) medical records activities; and (v) MyChart activities.

73.    In each of the Meta Pixel events that CRH sent to Facebook, CRH included the "c_user" cookie, which Facebook uses to identify users. Facebook could therefore connect cookie data that CRH transmitted with specific users. Furthermore, Facebook's "Your activity off Meta

---

[49] *Id.*

18

technologies" report confirms that Facebook received the data CRH shared with Facebook.

74.    CRH also disclosed to Facebook details about Plaintiffs' and Class Members' keyword searches and interactions with search results. For example, when a patient searched for the keyword, oncology, CRH sent PageView and Microdata events to Facebook. Both events reveal the patient's "query=oncology."

75.    Then, as the patient clicked to view CRH's page about its oncology services, CRH disclosed that activity, too, by sending another set of PageView and Microdata events. The events revealed that the patient opened a page at, "https://www.crossingrivers.org/services/oncology/" after they conducted a keyword search for "oncology." The Microdata event provides additional details about what the patient was learning about CRH's oncology services; i.e., the event discloses that CRH's oncology service "is an outpatient service that provides cancer patients the opportunity to receive their chemotherapy closer to home."

76.    CRH also disclosed when the patient clicked to learn more about the specifics of getting oncology services through SubscribedButtonClick events. From the Oncology page, the patient could (i) request an appointment or treatment with CRH; (ii) learn the locations that offered CRH's oncology services; (iii) obtain financial information about CRH's oncology services; and (iv) call CRH for more information about its oncology services. Each of such activities triggered CRH to send a SubscribedButtonClick event to Facebook, informing Facebook that the patient was on a page learning about "Oncology at Crossing Rivers Health," when the patient clicked (i) for "Appointments/Treatment; (ii) to find out "Where to go;" (iii) to learn about "Financial" information; and (iv) to call the phone number "tel:6083572630," respectively.

77.    In addition to disclosing patients' keyword search details, CRH also shared information with Facebook about patients' physician and services searches. When Plaintiffs and

Class Members browsed the provider directory to see a list of CRH's medical providers, CRH sent PageView and Microdata events informing Facebook that the patient was on the page to "Find a provider at Crossing Rivers Health."

78.   CRH offered patients the ability to narrow the providers listed in its directory by adding filters. When Plaintiffs and Class Members used these filters, CRH informed Facebook which filters patients applied. For example, when a patient set the filter to only browse CRH's providers with the specialty of oncology, CRH sent Facebook a PageView event that informs the patient was on a page for "providers/?specialty=Oncology." CRH then informed Facebook which providers the patient selected to view. When the patient opened the profile page for Lisa Gundersen, PA-C, for instance, CRH transmitted a pair of PageView and Microdata events disclosing the activity. Both events informed Facebook that the patient was viewing a page for "providers/lisa-gundersen/" with the Microdata event providing the additional detail that physician assistant Gundersen "provides oncology services at Crossing Rivers Health at Prairie du Chien."

79.   Likewise, CRH shared with Facebook Plaintiffs' and Class Members' searches for services. Upon a patient's arrival on Website's Services page, CRH sent PageView and Microdata events revealing the patient was browsing "Services available at Crossing Rivers Health." As the patient navigated to browse the services, CRH sent details about the patients' browsing activities to Facebook. For example, when the patient navigated to learn more about CRH's birthing services, CRH sent PageView and Microdata events revealing the patient was on a page for CRH's "birthing-center/." CRH also informed Facebook when the patient interacted with elements of CRH's Birthing Center page. When the patient clicked to call "tel:6083572000," CRH shared the phone number that the patient dialed and also revealed that the patient clicked to call CRH while learning about its Birthing Center. Similarly, when the patient navigated to view benefits of

choosing CRH's Birthing Center, CRH informed Facebook that the patient clicked a button labeled "We'll help you get ready for baby."

80.    CRH shared details about patients' appointments and booking activities. As a patient navigated to the page with the appointment request form, CRH disclosed that the patient was on the page, with "forms/" to "request-an-appointment/." Patients could also book classes and events offered by CRH through its webpage. Just as CRH informed Facebook when patients navigated to request appointments, CRH similarly shared details about patients as they navigated to book classes and events.

81.    As a patient loaded the "classes-and-events/" page, CRH transmitted PageView and Microdata events informing Facebook about the patient's activity.  CRH then shared details of the classes or events that the patient signed up for. For example, when a patient navigated to learn about "infant-loss-support-group/," and then registered for a spot in the group, CRH disclosed such details through PageView, Microdata, and SubscribedButtonClick events. First, when the patient loaded the Website support groups page and then navigated to the infant loss support group meeting, CRH transmitted PageView and Microdata events informing Facebook about this activity. Then, when the patient clicked to add the support group meeting to their calendar and clicked to register for the class, CRH sent SubscribedButtonClick events for both clicks, revealing that the patient clicked to "Add to calendar" and to "Sign up for the virtual group," respectively. Both events inform Facebook that the patient was viewing the page for an "Infant Loss Support Group" and included the specific start date and time of the meeting. When the patient loaded the page for the support group registration and submitted the online form to complete the registration, CRH transmitted PageView, Microdata, and SubscribedButtonClick events, each event confirming the patient's progress in the registration. The SubscribedButtonClick event confirms that the

patient clicked to "Submit" their "Infant Loss Support Group Registration" at CRH.

82.    CRH informed Facebook when patients navigated to learn about the management of medical records. Upon a patient loading the page about "Medical records at Crossing Rivers Health," CRH disclosed that activity by sending PageView and Microdata events. The Microdata event informs Facebook that the patient must "Complete an Authorization for Disclosure of Health Information to obtain a copy of your medical records or have them sent to another facility."

83.    Finally, RH informed Facebook when patients viewed CRH's pages about MyChart. Upon a patient loading the page for CRH's patients and visitors, CRH sent PageView and Microdata events which reveal that the patient was on a page to "Manage your care at Crossing Rivers Health." Then, CRH sent another set of PageView and Microdata events as the patient navigated to the page about CRH's MyChart, which allows patients to, among other care management functionalities, schedule appointments and make payments. Both events reveal that the patient was on a page for "mychart-patient-portal/."

84.    Because the Meta Pixel captures a transmits information about Plaintiffs' specific medical conditions and treatments alongside personally-identifying information, including IP addresses, this information constitutes Private Information, or PHI.

85.    Along with each reported event, the Meta Pixel transmitted to Facebook Plaintiff's and Class Members' personally identifying information, including their IP addressed, browser and device information, and, if applicable, Facebook IDs. Combined with information about Plaintiffs' specific medical conditions and treatments, this information constitutes Private Information, or PHI.

86.    After receiving Private Information about Plaintiffs and Class Members from Defendant, Facebook processed it, analyzed it, and assimilated it into its own massive datasets,

before selling access to this data in the form of targeted advertisements.

87.    Employing "Audiences"—subsections of individuals identified as sharing common traits—Facebook promises the ability to "find the people most likely to respond to your ad."[50] Advertisers can purchase the ability to target their ads based on a variety of criteria: "Core Audiences," individuals who share a location, age, gender, and/or language;[51] "Custom Audiences," individuals who have taken a certain action, such as visiting a website, using an app, or buying a product bought a product;[52] and/or "Lookalike Audiences," groups of individuals who "resemble" a Custom Audience, and who, as Facebook promises, "are likely to be interested in your business because they're similar to your best existing customers.[53]

88.    Google and other companies process data in a similar manner and use it to build marketing and other data profiles allowing for targeted online advertising.

89.    Defendant could have chosen not to use the Meta Pixel, or it could have configured it to limit the information that it communicated to Facebook, but it did not. Instead, it intentionally selected and took advantage of the features and functionality of the Pixel that resulted in the Disclosure of Plaintiffs' and Class Members' Private Information.

90.    Along those same lines, Defendant could have chosen not to use Google Analytics, Simplifi, DoubleClick, and CrazyEgg to track Plaintiffs and Class Members' private communications and transmit that information to unauthorized third parties. It did so anyway, intentionally taking advantage of these trackers, despite the harm to Plaintiffs and Class Members' privacy.

---

[50] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[51] *Id.*
[52] *Id.*
[53] How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Help Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

91.    Defendant used and disclosed Plaintiffs' and Class Members' Private Information to Facebook, Google, Simplifi, DoubleClick, and CrazyEgg for the purpose of marketing its services and increasing its profits.

92.    On information and belief, Defendants shared, traded, or sold Plaintiffs' and Class Members' Private Information with Facebook, Google, Simplifi, DoubleClick, and CrazyEgg in exchange for improved targeting and marketing services.

93.    Plaintiffs did not consent, agree, authorize, or otherwise permit Defendant to disclose their Private Information for marketing purposes. Defendant did not notify Plaintiffs and Class Members of their practice of disclosing patients' Private Information to Facebook, Google, Simplifi, DoubleClick, and CrazyEgg; nor did Defendant provide any means of opting out of these disclosures. Defendant, nonetheless, used Plaintiffs and Class Members' Private Information and knowingly disclosed that Private Information to unauthorized entities for Defendant's own gain.

94.    Plaintiffs and Class Members relied on Defendant to keep their Private Information confidential and securely maintained, to use this information for legitimate healthcare purposes only, and to make only authorized disclosures of this information.

95.    Defendant misrepresented that it would preserve the security and privacy of Plaintiffs' and Class Members' Private Information while knowingly disclosing their Private Information to unauthorized third parties.

96.    By law, Plaintiffs and the Class Members are entitled to privacy in their Private Information and confidential communications. CRH deprived Plaintiffs and Class Members of their privacy rights when it (1) implemented a system that surreptitiously tracked, recorded, and disclosed Plaintiffs' and Class Members' confidential communications, Personally Identifiable Information, and Protected Health Information; (2) disclosed patients' Private Information to

unauthorized, third-party eavesdroppers, including Facebook, Google, Simplifi, DoubleClick, and CrazyEgg; (3) profited from the Disclosure; and (4) undertook this pattern of conduct without notifying Plaintiffs and Class Members and without obtaining their express written consent.

## B. Plaintiffs' Experiences

### *Plaintiff Jane Doe*

97.    Plaintiff Jane Doe has been a patient of Defendant since 2004 and has received healthcare services from CRH and physicians in CRH's network. She has been treated for emergency care by Defendant. She also receives infusions from Defendant.

98.     Ms. Doe relied on CRH's Website and Online Platforms to communicate confidential patient information. Ms. Doe began using the Website and Online Platforms in 2012 or 2013. She last visited the Website and Online Platforms in November 2023. Ms. Doe has used the Website to search for doctors specializing in emergency medicine, cardiology, anesthesiology, primary care, and podiatry using the "Provider Directory" on the Website.

99.     Ms. Doe accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement. Ms. Doe reasonably expected that her online communications with CRH were confidential, solely between herself and CRH, and that, as such, those communications would not be transmitted to or intercepted by a third party.

100.    Ms. Doe provided her Private Information to Defendant and trusted that CRH would safeguard her Private Information, to its privacy policies and the law.

101.    Through its use of the Meta Pixel, Defendant disclosed to Facebook

    a.   Ms. Doe's identity;

    b.   Ms. Doe's status as a patient;

    c.   Ms. Doe's seeking of medical treatment;

    d.   Ms. Doe's health conditions and the treatment she sought; and

    e.   Ms. Doe's location.

102.   By failing to receive the requisite consent to disclose Ms. Doe's Private Information, CRH violated its agreements with Ms. Doe, its own policies, and the law.

103.   Since using Defendant's Website, Ms. Doe has received targeted online advertisements related to prescription medications (including Eliquis and Plavix), cardiology, toe fungus, and doctors.

104.   Plaintiff paid for Defendant's healthcare services, which included reasonable privacy and data security protections for Ms. Doe's Private Information; however, Ms. Doe did not receive the privacy and security protections for which she paid.

105.   Ms. Doe first discovered that Defendant was using the Meta Pixel and other tracking technologies to gather and disclose his Private Information in November of 2023.

106.   Because of Defendant's Disclosure, Ms. Doe has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of her Private Information; unauthorized access to her Private Information by third parties; use of her Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of her Private Information; lost benefit of her bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of her information.

### *Plaintiff Jane Roe*

107.   Plaintiff Jane Roe has been a patient of Defendant for approximately five or six years. She has received primary care and gynecological services from CRH and physicians in CRH's network.

108.   Ms. Roe relied on CRH's Website and Online Platforms to communicate

confidential patient information. Ms. Roe began using the Website and Online Platforms in 2022. She last visited the Website and Online Platforms in 2023. Ms. Roe has used the Website to search for doctors specializing in primary care and obstetrics/gynecology using the "Provider Directory" on the Website. She also used the website's general search bar to search for "OBGYN."

109.    Ms. Roe accessed Defendant's Website and Online Platforms at Defendant's direction and encouragement. Ms. Roe reasonably expected that her online communications with CRH were confidential, solely between herself and CRH, and that, as such, those communications would not be transmitted to or intercepted by a third party.

110.    Ms. Roe provided her Private Information to Defendant and trusted that CRH would safeguard her Private Information, to its privacy policies and the law.

111.    Through its use of the Meta Pixel, Defendant disclosed to Facebook

   a.   Ms. Roe's identity;

   b.   Ms. Roe's status as a patient;

   c.   Ms. Roe's seeking of medical treatment;

   d.   Ms. Roe's health conditions and the treatment she sought; and

   e.   Ms. Roe's location.

112.    By failing to receive the requisite consent to disclose Ms. Roe's Private Information, CRH violated its agreements with Ms. Roe, its own policies, and the law.

113.    Since using Defendant's Website, Ms. Roe has received targeted online advertisements related to birth control and menopause, as well as ads aimed at women, urging them to "take charge of [thei]r health."

114.    Plaintiff paid for Defendant's healthcare services, which included reasonable

27

privacy and data security protections for Ms. Roe's Private Information; however, Ms. Roe did not receive the privacy and security protections for which she paid.

115.    Ms. Roe first discovered that Defendant was using the Meta Pixel and other tracking technologies to gather and disclose his Private Information in November of 2023.

116.    Because of Defendant's Disclosure, Ms. Roe has suffered injuries, including monetary damages; loss of privacy; unauthorized disclosure of her Private Information; unauthorized access to her Private Information by third parties; use of her Private Information for advertising purposes; embarrassment, humiliation, frustration, and emotional distress; decreased value of her Private Information; lost benefit of her bargain; and increased risk of future harm resulting from further unauthorized use and disclosure of her information.

**C.  Investigations and Reports Reveal the Meta Pixel's Impermissible Collection of PHI**

117.    In June 2020, after promising users that app developers would not have access to data if users were not active in the prior 90 days, Facebook revealed that it still enabled third-party developers to access this data.[54] This failure to protect users' data enabled thousands of developers to see data on inactive users' accounts if those users were Facebook friends with someone who was an active user.

118.    On February 18, 2021, the New York State Department of Financial Services released a report detailing the significant privacy concerns associated with Facebook's data collection practices, including the collection of health data.  The report noted that while Facebook maintained a policy that instructed developers not to transmit sensitive medical information, Facebook received, stored, and analyzed this information anyway.  The report concluded that "[t]he information provided by Facebook has made it clear that Facebook's internal controls on

---

[54] Kurt Wagner & Bloomberg, Facebook Admits Another Blunder with User Data, FORTUNE (July 1, 2020 at 6:30 p.m.) https://fortune.com/2020/07/01/facebook-user-data-apps-blunder/.

this issue have been very limited and were not effective . . . at preventing the receipt of sensitive data."[55]

119.    The New York State Department of Financial Service's concern about Facebook's cavalier treatment of private medical data was not misplaced. In June 2022, the FTC finalized a different settlement involving Facebook's monetizing of sensitive medical data. In that case, the more than 100 million users of Flo, a period and ovulation tracking app, learned something startling:  the company was sharing their data with Facebook.[56] When a user was having their period or informed the app of their intention to get pregnant, Flo would inform Facebook, which could then use the data for targeted advertising.  In 2021, Flo settled with the Federal Trade Commission for lying to its users about secretly sharing their data with Facebook, as well as with a host of other internet advertisers, including Google, Fabric, AppsFlyer, and Flurry. The FTC reported that Flo "took no action to limit what these companies could do with users' information."[57]

120.    More recently, Facebook employees admitted to lax protections for sensitive user data.  In 2021, Facebook engineers on the ad business product team conceded "[w]e do not have an adequate level of control and explainability over how our systems use data, and thus we can't confidently make controlled policy changes or external commitments such as 'we will not use X data for Y purpose.'"[58]

---

[55] New York State Department of Financial Services, REPORT ON INVESTIGATION OF FACEBOOK INC. DATA PRIVACY CONCERNS, (Feb. 18, 2021)
https://www.dfs.ny.gov/system/files/documents/2021/02/facebook_report_20210218.pdf.
[56] Justin Sherman, Your Health Data Might Be for Sale, SLATE (June 22, 2022 at 5:50 a.m.)
https://slate.com/technology/2022/06/health-data-brokers-privacy.html.
[57] Id.
[58] Lorenzo Franceschi-Bicchierai, Facebook Doesn't Know What It Does with Your Data, or Where It Goes: Leaked Document, VICE (April 26, 2022) https://www.vice.com/en/article/akvmke/facebook-doesnt-know-what-it-does-with-your-data-or-where-it-goes.

121.    In June 2022, an investigation by The Markup[59] revealed that the Meta Pixel was embedded on the websites of 33 of the top 100 hospitals in the nation.[60] On those hospital websites, the Meta Pixel collects and sends Facebook a "packet of data," including sensitive personal health information, whenever a user interacts with the website, for example, by clicking a button to schedule a doctor's appointment.[61] The data is connected to an IP address, which is "an identifier that's like a computer's mailing address and can generally be linked to a specific individual or household—creating an intimate receipt of the appointment request for Facebook."[62]

122.    During its investigation, The Markup found that Facebook's purported "filtering" failed to discard even the most obvious forms of sexual health information. Worse, the article found that the data that the Meta Pixel was sending Facebook from hospital websites not only included patients' medications, descriptions of their allergic reactions, details about their upcoming doctor's appointments, but also patients' names, addresses, email addresses, and phone numbers.[63]

123.    In addition to the 33 hospitals identified by The Markup that had installed the Meta Pixel on their websites, The Markup identified seven health systems that had installed the Meta Pixel inside their password-protected patient portals.[64]

124.    David Holtzman, health privacy consultant and former senior privacy adviser in the U.S. Department of Health and Human Services' Office for Civil Rights, stated he was "deeply

---

[59] The Markup is a nonprofit newsroom that investigates how powerful institutions are using technology to change our society. *See* www.themarkup.org/about (last accessed Mar. 19, 2023).
[60] Todd Feathers, Simon Fondrie-Teitler, Angie Waller, & Surya Mattu, Facebook Is Receiving Sensitive Medical Information from Hospital Websites, THE MARKUP (June 16, 2022 6:00 a.m.) https://themarkup.org/pixel-hunt/2022/06/16/facebook-is-receiving-sensitive-medical-information-from-hospital-websites.
[61] *Id.*
[62] *Id.*
[63] *Id.*
[64] *Id.*

troubled" by what the hospitals capturing and sharing patient data in this way.[65]

**D. Defendant Violated HIPAA Standards**

125.    Under HIPAA, a healthcare provider may not disclose personally identifiable, non-public medical information (PHI) about a patient, a potential patient, or household member of a patient for marketing purposes without the patients' express written authorization.[66]

126.    Guidance from the U.S. Department of Health and Human Services instructs healthcare providers that patient status alone is protected by HIPAA.

127.    In Guidance regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act Privacy Rule, the Department instructs:

> Identifying information alone, such as personal names, residential addresses, or phone numbers, would not necessarily be designated as PHI. For instance, if such information was reported as part of a publicly accessible data source, such as a phone book, then this information would not be PHI because it is not related to health data… If such information was listed with health condition, health care provision, or payment data, such as an indication that the individual was treated at a certain clinic, then this information would be PHI.[67]

128.    In its guidance for Marketing, the Department further instructs:

> The HIPAA Privacy Rule gives individuals important controls over whether and how their protected health information is used and disclosed for marketing purposes. With limited exceptions, the Rule requires an individual's written authorization before a use or disclosure of his or her protected health information can be made for marketing. … Simply put, a covered entity may not sell protected health information to a business associate or any other third party for that party's own purposes. Moreover, covered entities may not sell lists of patients to third parties without obtaining authorization from each person on the list. (Emphasis

---

[65] *Id.*

[66] HIPAA, 42 U.S.C. § 1320; 45 C.F.R. §§ 164.502; 164.508(a)(3), 164.514(b)(2)(i).

[67] U.S. Department of Health and Human Services, Guidance Regarding Methods for De-identification of Protected Health Information in Accordance with the Health Insurance Portability and Accountability Act (HIPAA) Privacy Rule, (Nov. 26, 2012) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/De-identification/hhs_deid_guidance.pdf.

added).[68]

129.     In addition, HHS's Office for Civil Rights (OCR) issued a Bulletin to highlight the obligations of HIPAA-covered entities and business associates ("regulated entities") under the HIPAA Privacy, Security, and Breach Notification Rules ("HIPAA Rules") when using online tracking technology.[69]

130.     According to the Bulletin, "HIPAA Rules apply when the information that regulated entities collect through tracking technologies or disclose to tracking technology vendors includes protected health information."[70]

131.     The HHS Bulletin notes that such information—even when sent to an "unauthenticated webpage" (*i.e.*, a webpage that does not require users to log in before accessing the webpage) —constitutes a disclosure of PHI to the tracking technology vendor.[71]

132.     Citing The Markup's June 2022 article, the Bulletin expressly notes:

Some regulated entities may share sensitive information with online tracking technology vendors and such sharing may be unauthorized disclosures of PHI with such vendors. **Regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to tracking technology vendors or any other violations of the HIPAA Rules**. For example, disclosures of PHI to tracking technology vendors or marketing purposes, without individuals' HIPAA-compliant authorizations, would constitute impermissible disclosures.

An impermissible disclosure of an individual's PHI not only violates the Privacy Rule but also may result in a wide range of additional harms to the individual or others. For example, an impermissible disclosure of PHI may result in identity theft, financial loss, discrimination, stigma, mental anguish, or other serious negative consequences to the reputation, health, or physical safety of the individual or to

---

[68] U.S. Department of Health and Human Services, Marketing, (Dec. 3, 2002) https://www.hhs.gov/sites/default/files/ocr/privacy/hipaa/understanding/coveredentities/marketing.pdf.
[69] *See* U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.
[70] *Id.*
[71] U.S. Department of Health and Human Services, Use of Online Tracking Technologies by HIPAA Covered Entities and Business Associates, https://www.hhs.gov/hipaa/forprofessionals/privacy/guidance/hipaa-online-tracking/index.html.

others identified in the individual's PHI. Such disclosures can reveal incredibly sensitive information about an individual, including diagnoses, frequency of visits to a therapist or other health care professionals, and where an individual seeks medical treatment. While it has always been true that regulated entities may not impermissibly disclose PHI to tracking technology vendors, because of the proliferation of tracking technologies collecting sensitive information, now more than ever, it is critical for regulated entities to ensure that they disclose PHI **only** as expressly permitted or required by the HIPAA Privacy Rule. [72]

133.    In other words, HHS has expressly stated that Defendant's conduct of implementing the Meta Pixel violates HIPAA Rules.

**E.    Defendant Violated FTC Standards, and the FTC and HHS Take Action**

134.    The Federal Trade Commission ("FTC") has also recognized that implementation of the Meta Pixel and other tracking technologies pose "serious privacy and security risks" and "impermissibly disclos[e] consumers' sensitive personal health information to third parties."[73]

135.    On July 20, 2023, the FTC and HHS sent a "joint letter to approximately 130 hospital systems and telehealth providers to alert them about the risks and concerns about the use of technologies, such as Meta/Facebook pixel and Google Analytics, that can track a user's online activities."[74]

136.    Therein, the FTC reminded healthcare providers that "HIPAA regulated entities are not permitted to use tracking technologies in a manner that would result in impermissible disclosures of PHI to third parties or any other violations of the HIPAA Rules"[75] and that "[t]his is true even if you relied upon a third party to develop your website or mobile app and even if you

---

[72] *Id.* (emphasis in original) (internal citations omitted).
[73]  Re: Use of Online Tracking Technologies, U.S. Dep't of Health & Human Services, (July 20, 2023) (available at https://www.ftc.gov/system/files/ftc_gov/pdf/FTC-OCR-Letter-Third-Party-Trackers-07-20-2023.pdf), **Exhibit A.**
[74] FTC and HHS Warn Hospital Systems and Telehealth Providers about Privacy and Security Risks from Online Tracking Technologies, FEDERAL TRADE COMMISSION (July 20, 2023) https://www.ftc.gov/news-events/news/press-releases/2023/07/ftc-hhs-warn-hospital-systems-telehealth-providers-about-privacy-security-risks-online-tracking?utm_source=govdelivery.
[75] *Id.*

do not use the information obtained through use of a tracking technology for any marketing purposes."[76]

137.    Entities not covered by HIPAA also face accountability for disclosing consumers' sensitive health information under the Health Breach Notification Rule. 16 C.F.R. § 318. This Rule requires that companies dealing with health records notify the FTC and consumers if there has been a breach of unsecured identifiable health information, or else face civil penalties for violations. *Id*. According to the FTC, "a 'breach' is not limited to cybersecurity intrusions or nefarious behavior. Incidents of unauthorized access, *including sharing of covered information without an individual's authorization*, triggers notification obligations under the Rule."[77]

138.    Additionally, the FTC Act makes it unlawful to employ "[u]nfair methods of competition in or affecting commerce, and unfair or deceptive acts or practices in or affecting commerce[.]" 15 U.S.C. § 45(a). According to the FTC, "the disclosure of [sensitive health] information without a consumer's authorization can, in some circumstances, violate the FTC Act as well as constitute a breach of security under the FTC's Health Breach Notification Rule."[78]

139.    As such, the FTC and HHS have expressly stated that conduct like Defendant's runs afoul of the FTC Act and/or the FTC's Health Breach Notification Rule.

## F.  Defendant Violated Industry Standards

---

[76] *Id.*

[77] Statement of the Commission: On Breaches by Health Apps and Other Connected Devices, U.S. Fed. Trade Commission, (Sept. 15, 2021) (available at https://www.ftc.gov/system/files/documents/public_statements/1596364/statement_of_the_commission_on_breaches_by_health_apps_and_other_connected_devices.pdf) (emphasis added).

[78] *See, e.g.,* U.S. v. Easy Healthcare Corp., Case No. 1:23-cv-3107 (N.D. Ill. 2023), https://www.ftc.gov/legallibrary/browse/cases-proceedings/202-3186-easy-healthcare-corporation-us-v; In the Matter of BetterHelp, Inc., FTC Dkt. No. C-4796 (July 14, 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023169-betterhelp-inc-matter; U.S. v. GoodRx Holdings, Inc., Case No. 23-cv-460 (N.D. Cal. 2023), https://www.ftc.gov/legal-library/browse/cases-proceedings/2023090-goodrx-holdings-inc; In the Matter of Flo Health Inc., FTC Dkt. No. C-4747 (June 22, 2021), https://www.ftc.gov/legal-library/browse/casesproceedings/192-3133-flo-health-inc.

140.    A medical provider's duty of confidentiality is a cardinal rule, embedded in doctor-patient and hospital-patient relationships.

141.    The American Medical Association's ("AMA") Code of Medical Ethics requires the protection of patient privacy and communications, and these rules are applicable to CRH and its physicians.

142.    AMA Code of Ethics Opinion 3.1.1 provides:

Protecting information gathered in association with the care of the patient is a core value in health care . . . . Patient privacy encompasses a number of aspects, including . . . personal data (informational privacy).

143.    AMA Code of Medical Ethics Opinion 3.2.4 provides:

Information gathered and recorded in association with the care of the patient is confidential. Patients are entitled to expect that the sensitive personal information they divulge will be used solely to enable their physician to most effectively provide needed services. Disclosing information for commercial purposes without consent undermines trust, violates principles of informed consent and confidentiality, and may harm the integrity of the patient-physician relationship. Physicians who propose to permit third-party access to specific patient information for commercial purposes should: (a) Only provide data that has been de-identified. [and] (b) Fully inform each patient whose record would be involved (or the patient's authorized surrogate when the individual lacks decision-making capacity about the purposes for which access would be granted.

144.    AMA Code of Medical Ethics Opinion 3.3.2 provides:

Information gathered and recorded in association with the care of a patient is confidential, regardless of the form in which it is collected or stored. Physicians who collect or store patient information electronically . . . must . . . release patient information only in keeping ethics guidelines for confidentiality.

**G. Plaintiffs' and Class Members' Expectation of Privacy**

145.    At all times when Plaintiffs and Class Members provided their Private Information to Defendant, they had a reasonable expectation that the information would remain private and that Defendant would not share the Private Information with third parties for a commercial marketing and sales purposes, unrelated to patient care.

35

**H.  IP Addresses are Personally Identifiable Information**

146.    Defendant also disclosed Plaintiffs' and Class Members' IP addresses to Facebook, Google, and others through its use of the Meta Pixel and other tracking technologies.

147.    An IP address is a number that identifies the address of a device connected to the Internet.

148.    IP addresses are used to identify and route communications on the Internet.

149.    IP addresses of individual Internet users are used by Internet service providers, Websites, and third-party tracking companies to facilitate and track Internet communications.

150.    Facebook tracks every IP address ever associated with a Facebook user.

151.    Facebook tracks IP addresses for use of targeting individual homes and their occupants with advertising.

152.    Under HIPAA, an IP address is Personally Identifiable Information:

- HIPAA defines personally identifiable information to include "any unique identifying number, characteristic or code," specifically listing IP addresses as an example of PII.  *See* 45 C.F.R. § 164.514 (2).

- HIPAA further declares information as personally identifiable where the covered entity has "actual knowledge that the information to identify an individual who is a subject of the information." 45 C.F.R. § 164.514(2)(ii); *See also*, 45 C.F.R. § 164.514(b)(2)(i)(O).

153.    Consequently, by disclosing IP addresses, Defendant's business practices violated HIPAA and industry privacy standards.

**I.  Defendant Was Enriched and Benefitted from the Use of Trackers and Unauthorized Disclosures**

154.    The sole purpose for Defendant's use of the Meta Pixel and other tracking technology was to enhance its marketing efforts and increase its profits.

155.    In exchange for disclosing the Private Information of its patients, Defendant was

compensated by Facebook, Google, and likely others, in the form of enhanced advertising services and more cost-efficient marketing.

156.    Retargeting is a form of online marketing that targets users with ads based on their previous internet communications and interactions. Upon information and belief, as part of its marketing campaign, Defendant re-targeted patients and potential patients.

157.    By utilizing the Meta Pixel and other trackers, the cost of advertising and retargeting was reduced, thereby benefiting Defendant.

**J.  Plaintiffs' and Class Members' Private Information Had Financial Value**

158.    The data concerning Plaintiffs and Class Members, collected, and shared by Defendant, has tremendous economic value. Data collected via the Meta Pixel, CAPI, and other online tracking tools allows Facebook to build its own massive, proprietary dataset, to which it then sells access in the form of targeted advertisements. Targeting works by allowing advertisers to direct their ads at particular "Audiences," subsets of individuals who, according to Facebook, are the "people most likely to respond to your ad."[79] Facebook's "Core Audiences" allow advertisers to target individuals based on demographics, such as age, location, gender, or language, whereas "Custom Audiences" allow advertisers to target individuals who have "already shown interest in your business," by visiting a business's website, using an app, or engaging in certain online content.[80] Facebook's "Lookalike Audiences" go further, targeting individuals who resemble current customer profiles and whom, according to Facebook, "are likely to be interested in your business."[81]

---

[79] Audience Ad Targeting, Meta, https://www.facebook.com/business/ads/ad-targeting (last visited Aug. 14, 2023).
[80] *Id.*
[81] *See* How to Create a Lookalike Audience on Meta Ads Manager, Meta Business Center, https://www.facebook.com/business/help/465262276878947 (last visited Aug. 14, 2023).

159.    Data harvesting is big business, and it drives Facebook's profit center, its advertising sales. In 2019, Facebook generated nearly $70 billion dollars in advertising revenue alone, constituting more than 98% of its total revenue for that year.[82]

160.    This business model is not limited to Facebook. Data harvesting one of the fastest growing industries in the country, and consumer data is so valuable that it has been described as the "new oil." Conservative estimates suggest that in 2018, Internet companies earned $202 per American user from mining and selling data. That figure is only due to keep increasing; estimates for 2022 were as high as $434 per user, for a total of more than $200 billion industry wide.

161.    In particular, the value of health data is well-known due to the media's extensive reporting on the subject. For example, Time Magazine published an article in 2017 titled "How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry." Therein, it described the extensive market for health data and observed that the health data market is both lucrative and a significant risk to privacy.[83]

162.    Similarly, CNBC published an article in 2019 in which it observed that "[d]e-identified patient data has become its own small economy: There's a whole market of brokers who compile the data from providers and other health-care organizations and sell it to buyers."[84]

**TOLLING, CONCEALMENT, AND ESTOPPEL**

163.    The applicable statutes of limitation have been tolled as a result of CRH's knowing and active concealment and denial of the facts alleged herein.

---

[82] *See* Here's How Big Facebook's Ad Business Really Is, CNN, https://www.cnn.com/2020/06/30/tech/facebook-ad-business-boycott/index.html (last visited Aug. 14, 2023).

[83] *See* Adam Tanner, How Your Medical Data Fuels a Hidden Multi-Billion Dollar Industry, TIME, (Jan. 9, 2017, at 9:00 a.m.) https://time.com/4588104/medical-data-industry/.

[84] *See* Christina Farr, Hospital Execs Say They are Getting Flooded with Requests for Your Health Data, CNBC, (Dec. 18, 2019, at 8:27 a.m.) https://www.cnbc.com/2019/12/18/hospital-execs-say-theyre-flooded-with-requests-for-your-health-data.html.

164.    CRH seamlessly incorporated Meta Pixel and other trackers into its Website and Online Platforms while providing patients with no indication that their Website usage was being tracked and transmitted to third parties. CRH knew that its Website incorporated Meta Pixel and other trackers, yet it failed to disclose to Plaintiffs and Class Members that their sensitive medical information would be intercepted, collected, used by, and disclosed to Facebook, Simplifi, DoubleClick, and CrazyEgg.

165.    Even while exercising due diligence, Plaintiffs and Class Members could not have discovered the full scope of CRH's conduct, because there were no disclosures or other indications that they were interacting with websites employing Meta Pixel or any other tracking technology.

166.    All applicable statutes of limitation have also been tolled by operation of the discovery rule and the doctrine of continuing tort. CRH's illegal interception and disclosure of Plaintiffs' Private Information has continued unabated through June 2, 2023. What is more, CRH was under a duty to disclose the nature and significance of their data collection practices but did not do so. CRH is therefore, is estopped from relying on any statute of limitations defenses.

## CLASS ALLEGATIONS

167.    Plaintiffs bring this statewide class action on behalf of themselves and on behalf of other similarly situated persons.

168.    The statewide Class that Plaintiffs seeks to represent is defined as follows:

**All Wisconsin citizens whose Private Information was disclosed by Defendant to third parties through the Meta Pixel and related technology without authorization.**

169.    Excluded from the Class are the following individuals and/or entities: Defendant and Defendant's parents, subsidiaries, affiliates, officers, and directors, and any entity in which Defendant has a controlling interest; all individuals who make a timely election to be excluded

from this proceeding using the correct protocol for opting out; any and all federal, state, or local governments, including but not limited to their departments, agencies, divisions, bureaus, boards, sections, groups, counsels, and/or subdivisions; and all judges assigned to hear any aspect of this litigation, as well as their immediate family members.

170.    Plaintiffs reserve the right to modify or amend the definition of the proposed class before the Court determines whether certification is appropriate.

171.    <u>Numerosity</u>: Class Members are so numerous that joinder of all members is impracticable. Upon information and belief, there are hundreds or thousands of individuals whose Private Information may have been improperly used or disclosed by Defendant, and the Class is identifiable within Defendant's records.

172.    <u>Ascertainability</u>. Class Members are readily identifiable from information in Defendant's possession, custody, and control.

173.    <u>Commonality</u>: Questions of law and fact common to the Class exist and predominate over any questions affecting only individual Class Members. These include

 a. whether and to what extent Defendant had a duty to protect Plaintiffs' and Class Members' Private Information;

 b. whether Defendant had duties not to disclose the Plaintiffs' and Class Members' Private Information to unauthorized third parties;

 c. whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for non-healthcare purposes;

 d. whether Defendant had duties not to use Plaintiffs' and Class Members' Private Information for unauthorized purposes;

 e. whether Defendant failed to adequately safeguard Plaintiffs' and Class Members'

Private Information;

f.   whether Defendant adequately, promptly, and accurately informed Plaintiffs and Class Members that their Private Information had been compromised;

g.   whether Defendant violated the law by failing to promptly notify Plaintiffs and Class Members that their Private Information had been compromised;

h.   whether Defendant failed to properly implement and configure the tracking software on its Online Platforms to prevent the disclosure of confidential communications and Private Information;

i.   whether Defendant's conduct amounts to negligence *per se*;

j.   whether Defendant committed invasion of privacy;

k.   whether Defendant breached its contract with Plaintiffs and the Class Members; or in the alternate, whether Defendant was unjustly enriched; and,

l.   whether Defendant breached fiduciary duties to Plaintiffs and the Class Members.

m.  whether Defendant engaged in unfair, unlawful, or deceptive practices by misrepresenting that it would safeguard Plaintiffs' and Class Members' Private Information.

174.   <u>Typicality</u>: Plaintiffs' claims are typical of those of other Class Members because all had their Private Information compromised as a result of Defendant's use and incorporation of Meta Pixel and other tracking technology.

175.   <u>Policies Generally Applicable to the Class</u>: This class action is also appropriate for certification because Defendant has acted or refused to act on grounds generally applicable to the Class, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class Members and making final injunctive relief appropriate with respect

to the Class as a whole. Defendant's policies challenged herein apply to and affect Class Members uniformly, and Plaintiffs' challenge of these policies hinges on Defendant's conduct with respect to the Class as a whole, not on facts or law applicable only to Plaintiff.

176.    Adequacy: Plaintiffs will fairly and adequately represent and protect the interests of the Class Members in that Plaintiffs has no disabling conflicts of interest that would be antagonistic to those of the other Class Members. Plaintiffs seek no relief that is antagonistic or adverse to the Class Members and the infringement of the rights and the damages Plaintiffs has suffered is typical of other Class Members. Plaintiffs have also retained counsel experienced in complex class action litigation, and Plaintiffs intends to prosecute this action vigorously.

177.    Superiority and Manageability: Class litigation is an appropriate method for fair and efficient adjudication of the claims involved. Class action treatment is superior to all other available methods for the fair and efficient adjudication of the controversy alleged herein; it will permit a large number of Class Members to prosecute their common claims in a single forum simultaneously, efficiently, and without the unnecessary duplication of evidence, effort, and expense that hundreds of individual actions would require. Class action treatment will permit the adjudication of relatively modest claims by certain Class Members, who could not individually afford to litigate a complex claim against large corporations, like Defendant. Further, even for those Class Members who could afford to litigate such a claim, it would still be economically impractical and impose a burden on the courts.

178.    The nature of this action and the nature of laws available to Plaintiffs and Class Members make the use of the class action device a particularly efficient and appropriate procedure to afford relief to Plaintiffs and Class Members for the wrongs alleged. If the class action device were not used, Defendant would necessarily gain an unconscionable advantage because they would

be able to exploit and overwhelm the limited resources of each individual Class Member with superior financial and legal resources. Moreover, the costs of individual suits could unreasonably consume the amounts that would be recovered, whereas proof of a common course of conduct to which Plaintiffs were exposed is representative of that experienced by the Class and will establish the right of each Class Member to recover on the cause of action alleged. Finally, individual actions would create a risk of inconsistent results and would be unnecessary and duplicative of this litigation.

179.    The litigation of the claims brought herein is manageable. Defendant's uniform conduct, the consistent provisions of the relevant laws, and the ascertainable identities of Class Members demonstrate that there would be no significant manageability problems with prosecuting this lawsuit as a class action.

180.    Adequate notice can be given to Class Members directly using information maintained in Defendant's records.

181.    Unless a Class-wide injunction is issued, Defendant may continue in its unlawful use and disclosure of Class Members' Private Information; failure to properly secure the Private Information of Class Members; and refusal to provide proper notification to and obtain proper consent from Class Members.

182.    Further, Defendant has acted or refused to act on grounds generally applicable to the Class, and, accordingly, final injunctive or corresponding declaratory relief regarding the whole of the Class is appropriate.

183.    Likewise, particular issues are appropriate for certification because such claims present only particular, common issues, the resolution of which would advance the disposition of this matter and the parties' interests therein. Such particular issues include, but are not limited to

a.  whether Defendant owed a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

b.  whether Defendant breached a legal duty to Plaintiffs and Class Members to exercise due care in collecting, storing, using, and safeguarding their Private Information;

c.  whether Defendant failed to comply with its own policies and applicable laws, regulations, and industry standards relating to the disclosure of patient information;

d.  whether an implied contract existed between Defendant on the one hand, and Plaintiffs and Class Members on the other, and the terms of that implied contract;

e.  whether Defendant breached the implied contract;

f.  in the alternate, whether Defendant was unjustly enriched;

g.  whether Defendant adequately and accurately informed Plaintiffs and Class Members that their Private Information had been used and disclosed to third parties;

h.  whether Defendant failed to implement and maintain reasonable security procedures and practices;

i.  whether Defendant committed an invasion of privacy;

j.  whether Defendant had fiduciary duties to Plaintiffs and the Class Members;

k.  whether Defendant breached its fiduciary duties; and,

l.  whether Defendant engaged in unfair, unlawful, or deceptive practices by failing to safeguard Plaintiffs' and Class Members' Private Information; and

m.  whether Plaintiffs and the Class Members are entitled to actual, consequential, and/or nominal damages, and/or injunctive relief as a result of Defendant's wrongful conduct.

44

## COUNT I
## NEGLIGENCE
### (On Behalf of Plaintiffs and the Class)

184.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

185.    Defendant owed to Plaintiffs and Class Members a duty to exercise reasonable care in handling and using Plaintiffs' and Class Members' Private Information in its care and custody, including implementing industry-standard privacy procedures sufficient to reasonably protect the information from the disclosure and unauthorized transmittal and use of Private Information that occurred.

186.    Defendant acted with wanton and reckless disregard for the privacy and confidentiality of Plaintiffs' and Class Members' Private Information by disclosing and providing access to this information to third parties for the financial benefit of the third parties and Defendant.

187.    Defendant owed these duties to Plaintiffs and Class Members because they are members of a well-defined, foreseeable, and probable class of individuals whom Defendant knew or should have known would suffer injury-in-fact from Defendant's disclosure of their Private Information to benefit third parties and Defendant. Defendant actively sought and obtained Plaintiffs' and Class Members' Private Information.

188.    Private Information is highly valuable, and Defendant knew, or should have known, the harm that would be inflicted on Plaintiffs and Class Members by disclosing their Private Information to third parties. This disclosure was of benefit to third parties and Defendant by way of data harvesting, advertising, and increased sales.

189.    Defendant breached its duties by failing to exercise reasonable care in supervising its agents, contractors, vendors, and suppliers in the handling and securing of Private Information of Plaintiffs and Class Members. This failure actually and proximately caused Plaintiffs' and Class

Members' injuries.

190.    As a direct and traceable result of Defendant's negligence and/or negligent supervision, Plaintiffs and Class Members have suffered or will suffer damages, including monetary damages, inappropriate advertisements and use of their Private Information for advertising purposes, and increased risk of future harm, embarrassment, humiliation, frustration, and emotional distress.

191.    Defendant's breach of its common-law duties to exercise reasonable care proximately caused Plaintiffs' and Class Members' actual, tangible, injury-in-fact and damages, including, without limitation, the unauthorized access of their Private Information by third parties, improper disclosure of their Private Information, lost benefit of their bargain, and lost value of their Private Information. These injuries are ongoing, imminent, immediate, and continuing.

192.    In failing to secure Plaintiffs' and Class Members' Private Information, PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seek punitive damages on behalf of themselves and the Class.

## COUNT II
### NEGLIGENCE *PER SE*
### (On Behalf of Plaintiffs and the Class)

193.    Plaintiffs re-allege and incorporate by reference all other paragraphs in the Complaint as if fully set forth herein.

194.    Plaintiffs allege this negligence *per se* theory as an alternative to their other negligence claim.

195.    Pursuant to the laws set forth herein, including the FTC Act, HIPAA, the HIPAA

Privacy Rule and Security Rule, 45 C.F.R. Part 160 and Part 164, Subparts A and E ("Standards for Privacy of Individually Identifiable Health Information"), and Security Rule ("Security Standards for the Protection of Electronic Protected Health Information"), 45 C.F.R. Part 160 and Part 164, Subparts A and C and the other sections identified above, Defendant was required by law to maintain adequate and reasonable data and cybersecurity measures to maintain the security and privacy of Plaintiffs' and Class Members' Private Information.

196.    Plaintiffs and Class Members are within the class of persons that these statutes and rules were designed to protect.

197.    Defendant had a duty to have procedures in place to detect and prevent the loss or unauthorized dissemination of Plaintiffs' and Class Members' PII and PHI.

198.    Defendant owed a duty to timely and adequately inform Plaintiffs and Class Members, in the event of their PII and PHI being improperly disclosed to unauthorized third parties.

199.    It was not only reasonably foreseeable, but it was intended, that the failure to reasonably protect and secure Plaintiffs' and Class Members' PII and PHI in compliance with applicable laws would result in an unauthorized third parties such as Facebook, Google, and others gaining access to Plaintiffs' and Class Members' PII and PHI, and resulting in Defendant's liability under principles of negligence *per se*.

200.    Defendant violated its duty under Section 5 of the FTC Act by failing to use reasonable measures to protect Plaintiffs' and Class Members' PII and PHI and not complying with applicable industry standards as described in detail herein.

201.    Plaintiffs' and Class Member's PII and PHI constitute personal property that was taken and misused as a proximate result of Defendant's negligence, resulting in harm, injury and

damages to Plaintiffs and Class Members.

202.    As a proximate result of Defendant's negligence and breach of duties as set forth above, Defendant's breaches of duty caused Plaintiffs and Class Members to, *inter alia*, have their data shared with third parties without their authorization or consent, receive unwanted advertisements that reveal seeking treatment for specific medical conditions, fear, anxiety and worry about the status of their PII and PHI, diminution in the value of their personal data for which there is a tangible value, and/or a loss of control over their PII and PHI, all of which can constitute actionable actual damages.

203.    In failing to secure Plaintiffs' and Class Members' PII and PHI, Defendant is guilty of oppression, fraud, or malice. Defendant acted or failed to act with a reckless, willful, or conscious disregard of Plaintiffs' and Class Members' rights. Plaintiffs, in addition to seeking actual damages, also seek punitive damages on behalf of themselves and the Class.

204.    Defendant's conduct in violation of applicable laws directly and proximately caused the unauthorized access and disclosure of Plaintiffs' and Class Members' PII and PHI, and as a result, Plaintiffs and Class Members have suffered and will continue to suffer damages as a result of Defendant's conduct. Plaintiffs and Class Members seek actual, compensatory, and punitive damages, and all other relief they may be entitled to as a proximate result of Defendant's negligence *per se*.

## COUNT III
### INVASION OF PRIVACY, WIS. STAT. § 995.50
### (On Behalf of Plaintiffs and the Class)

205.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

206.    Wisconsin recognizes the tort of invasion of privacy, which it defines as "[i]ntrusion upon the privacy of another of a nature highly offensive to a reasonable person . . . in

a place that a reasonable person would consider private, or in a manner that is actionable for trespass," Wis. Stat. § 995.50(2)(am)(1), or "[p]ublicity given to a matter concerning the private life of another, of a kind highly offensive to a reasonable person, if the defendant has acted either unreasonably or recklessly as to whether there was a legitimate public interest in the matter involved, or with actual knowledge that none existed." Wis. Stat. § 995.50(2)(am)(3).

207.    Plaintiffs and Class Members had a reasonable expectation of privacy in their confidential communications with Defendant while using Defendant's Website and Online Platforms. Patients simply do not expect their health provider to secretly track and record their communications without authorization by or notice to patients.

208.    Plaintiffs and Class Members' expectation of privacy was reasonable given Defendants' representations in its Privacy Policy and the absence of any Website privacy policy relating to or disclosing CRH's employ of tracking technologies on the Website.

209.    Defendant intentionally intruded upon Plaintiffs and Class Members' privacy by secretly tracking and recording their confidential communications and Private Information while they used Defendant's Website.

210.    Defendant's intrusion into Plaintiffs and Class Members' confidential communications with their health care provider is highly offensive to the reasonable person.

211.    By using the Meta Pixel and other tracking technologies to intrude upon Plaintiffs' and Class Members' private matters, CRH violated Wisconsin Statute § 995.50(2)(am)(1).

212.    Furthermore, by sharing Plaintiffs and Class Members' confidential communications and Private Information with Facebook, Google, Simplifi, DoubleClick, and CrazyEgg, Defendant gave publicity to the private lives of Plaintiffs and Class Members.

213.    A health care provider's (such as Defendant's) unauthorized Disclosure of its

patients' confidential communications and Private Information is highly offensive to a reasonable person.

214.    Defendant knew or should have known that there was no legitimate public interest in the confidential communications and Private Information that it disclosed to Facebook, Google, Simplifi, DoubleClick, and CrazyEgg.

215.    By using the Meta Pixel and other tracking technologies to give publicity to Plaintiffs' and Class Members' private matters, CRH violated Wisconsin Statute § 995.50(2)(am)(3).

216.    Defendant acted with a knowing state of mind when it used Meta Pixel and other tracking technologies to track, record, and disclose to unauthorized third parties its patients' Private Information.

217.    As a result of Defendant's actions, Plaintiff and Class Members have suffered harm and injury, including, but not limited to, an invasion of their privacy rights.

218.    Plaintiff and Class Members have been injured as a direct and proximate result of Defendant's invasion of their privacy and are entitled to just compensation, including monetary damages.

219.    As a proximate result of Defendant's acts and omissions, Plaintiffs' and Class Members' Private Information is now available for further disclosure and redisclosure, without authorization, by unauthorized third parties. This has inflicted further injuries on Plaintiffs and the Class.

220.    Under Wisconsin Statute § 995.50(1), Plaintiffs and Class Members are entitled to equitable relief to prevent and restrain such invasion, compensatory damages based either on Plaintiffs' loss or Defendant's unjust enrichment, and reasonable attorney fees, as well as any other

relief the Court deems just and proper.

## COUNT IV
## BREACH OF IMPLIED CONTRACT
### (On behalf of Plaintiffs and the Class)

221.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

222.    As a condition of receiving medical care from Defendant, Plaintiffs and the Class provided their Private Information and paid compensation for the treatment received. In so doing, Plaintiffs and Class Members entered into contracts with Defendant by which Defendant agreed to safeguard and protect such information, in its Privacy Policy and elsewhere, to keep such information secure and confidential, and to timely and accurately notify Plaintiffs and the Class if their data had been breached and compromised or stolen.

223.    Implicit in the agreement between CRH and its patients, Plaintiffs and the proposed Class Members, was the obligation that both parties would maintain the Private Information confidentially and securely.

224.    CRH had an implied duty of good faith to ensure that the Private Information of Plaintiffs and Class Members in its possession was only to be used as authorized, such as to provide medical treatment, billing, and other medical benefits from CRH.

225.    CRH had an implied duty to protect the Private Information of Plaintiffs and Class Members from unauthorized disclosure or uses, and to notify them of any breach of that information.

226.    Additionally, CRH implicitly promised to retain this Private Information only under conditions that kept such information secure and confidential.

227.    Plaintiffs and Class Members fully performed their obligations under the implied contract with CRH, but Defendant did not. Plaintiffs and Class Members would not have provided

their confidential Private Information to CRH in the absence of their implied contracts with CRH that their Private Information would be kept in confidence and would instead have retained the opportunity to control their Private Information for uses other than receiving medical treatment from CRH.

228.    CRH breached the implied contracts with Plaintiffs and Class members by disclosing Plaintiffs' and Class Members' Private Information to unauthorized third parties and failing to notify them of the breach of that Private Information.

229.    CRH's acts and omissions have materially affected the intended purpose of the implied contracts that required Plaintiffs and Class Members to provide their Private Information in exchange for medical treatment and benefits.

230.    As a direct and proximate result of Defendant's breach of contract, Plaintiffs and the Class have suffered (and will continue to suffer) the compromise and disclosure of their Private Information and identities.

231.    As a direct and proximate result of Defendant's above-described breach of contract, Plaintiffs and the Class are entitled to recover actual, consequential, and nominal damages.

## COUNT V
## UNJUST ENRICHMENT
### (On Behalf of Plaintiffs and the Class)

232.    Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

233.    This claim is pleaded solely in the alternative to Plaintiffs' breach of implied contract claim.

234.    Plaintiffs and Class Members conferred a monetary benefit upon CRH in the form

of valuable sensitive medical information that Defendant collected from Plaintiffs and Class Members under the guise of keeping this information private. Defendant collected, used, and disclosed this information for its own gain, including for advertisement purposes, sale, or trade for valuable services from third parties. Additionally, Plaintiffs and the Class Members conferred a benefit on Defendant in the form of monetary compensation.

235.   Plaintiffs and Class Members would not have used CRH's services or would have paid less for those services, if they had known that Defendant would collect, use, and disclose their Private Information to third parties.

236.   CRH appreciated or had knowledge of the benefits conferred upon it by Plaintiffs and Class Members.

237.   As a result of CRH's conduct, Plaintiffs and Class Members suffered actual damages in an amount equal to the difference in value between their purchases made with reasonable data privacy and security practices and procedures that Plaintiffs and Class Members paid for, and those purchases without unreasonable data privacy and security practices and procedures that they received.

238.   The benefits that Defendant derived from Plaintiffs and Class Members rightly belong to Plaintiffs and Class Members themselves. Under unjust enrichment principles, it would be inequitable for Defendant to retain the profit and/or other benefits it derived from the unfair and unconscionable methods, acts, and trade practices alleged in this Complaint.

239.   CRH should be compelled to disgorge into a common fund for the benefit of Plaintiffs and Class Members all unlawful or inequitable proceeds it received as a result of its conduct and the unauthorized Disclosure alleged herein.

**COUNT VI**
**BREACH OF FIDUCIARY DUTY**

**(On Behalf of Plaintiffs and the Class)**

240.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

241.    As the Wisconsin Supreme Court recognized in *Steinberg v. Jensen*, "[p]hysicians owe an ethical duty of confidentiality to their patients."  194 Wis.2d 439, 465 (Wis. 1995). This ethical duty owed by physicians is generally set forth in the Hippocratic Oath, the American Medical Association's Principles of Medical Ethics, and the Current Opinions of the Judicial Counsel of the American Medical Association. *Id.* This ethical duty prohibits doctors from disclosing confidential information about their patients without their patients' consent.

242.    A relationship existed between Plaintiffs and the Class, on the one hand, and Defendant, on the other, in which Plaintiffs and the Class put their trust in Defendant to protect their Private Information, and Defendant accepted that trust.

243.    Given the doctor-patient or healthcare provider-patient relationship between Defendant and Plaintiffs and Class Members where Defendant provided healthcare and became the guardian of their Private Information, Defendant owed Plaintiffs and Class Members a duty to act for the benefit of Plaintiffs and Class Members to safeguard their Private Information, to only disclose their Private Information with their express authorization or consent, and to timely notify them in the event of their Private Information was disclosed without authorization.

244.    Because of the overly sensitive nature of the Private Information, Plaintiffs and Class Members would not have entrusted Defendant with their Private Information had they known that Defendant would disclose—without consent—patients' Private Information to third parties.

245.    Defendant breached its ethical duty of confidentiality to Plaintiffs and Class members by failing to safeguard Plaintiffs' and Class Members' Private Information, disclosing Plaintiffs' and Class Members' Private Information without their authorization or consent, and

failing to notify Plaintiffs and Class Members that their Private Information had been disclosed without their authorization or consent.

246.    Defendant's breach of fiduciary duty was a legal cause of injury-in-fact and damages to Plaintiffs and the Class.

247.    But for Defendant's breach of fiduciary duty, the injury-in-fact and damages to Plaintiffs and the Class would not have occurred.

248.    Defendant's breach of fiduciary duty substantially contributed to the injury and damages to the Plaintiffs and the Class.

249.    As a direct and proximate result of Defendant's breach of fiduciary duty, Plaintiffs and Class Members are entitled to and demand actual, consequential, and nominal damages, injunctive relief, and all other relief allowed by law.

**<u>COUNT VII</u>**
**MISREPRESENTATION**
**(On Behalf of Plaintiffs and the Class)**

250.    Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

251.    Wisconsin recognizes the common law tort of misrepresentation.

252.    Defendant knowingly made false and deceptive representations regarding its privacy and data security practices and policies in its Privacy Policy, including enumerating specific uses and ways in which Private Information could be shared.

253.     Defendant made the representations knowing they were untrue, or recklessly, without caring whether they were true or false. Defendant made these misrepresentations with intent to defraud and to induce Plaintiffs and the Notice Class Members to rely and act upon them.

254.    Plaintiffs and the Class Members believed the statements in Defendant's Privacy

55

Policy to be true and relied on them to their detriment.

255.     As a result of Defendant's false and misleading statements, Plaintiffs and the Class Members have suffered additional pecuniary loss and injury-in-fact, including, without limitation, lost benefit of their bargain and lost value of their Private Information.

<u>**COUNT VIII**</u>
**CONVERSION**
**(On Behalf of Plaintiffs and the Class)**

256.     Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

257.     Wisconsin recognizes the common law tort of conversion.

258.     Defendant's interception of Plaintiffs' and Class Member's electronic communications for the purpose of bartering or selling Plaintiffs' and Class Members' Private Information to Facebook, Google, and other unauthorized third parties in exchange for advertising services constitutes the tort of conversion.

259.     Conversion occurs where there is an unauthorized assumption of the right of ownership over the personal property of another to the exclusion of the owner's property rights.

260.     Plaintiffs' and Class Members' Private Information is valuable property under the exclusive ownership of the patient. As set forth above, that information has significant market value.

261.     Defendant took control of Plaintiffs' and Class Members' Private Information and, without consent or disclosure, sold or bartered that information in return for access to the Meta Pixel tool. Defendant's wrongful actions, including its failure to safeguard Plaintiffs' and Class Members' Private Information, resulted in injury to Plaintiffs and Class Members because their Private Information is now in the hands of unauthorized persons and has thus been compromised.

262.    In doing so, Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value.

263.    Defendant's interference with Plaintiffs' and Class Members' their property (their Private Information) directly caused, at minimum, the following damages.

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendants eroded the essential confidential nature of the doctor-patient and provider-patient relationship; and

c.    Defendants took something of value from Plaintiffs and Class Members—and then derived benefit therefrom without Plaintiffs and Class Members' knowledge, consent, or authorization and without sharing the benefit of such value.

<u>**COUNT IX**</u>
**VIOLATION OF WISCONSIN DECEPTIVE TRADE PRACTICES ACT ("DTPA"),**
**WIS. STAT. §§ 100.18**
**(On Behalf of Plaintiffs and the Class)**

264.    Plaintiffs re-allege and incorporate the preceding paragraphs of this Complaint as if fully set forth herein.

265.    Under the DTPA, "no person, firm, [or] corporation . . . with intent to sell, distribute, increase the consumption of or in any wise dispose of any . . . service . . . shall make, publish, disseminate, circulate or place before the public . . . a statement or representation of any kind to the public relating to such . . . service . . . or to the terms of conditions thereof, which . . . statement or representation contains any assertion, representation, or statement of fact which is untrue, deceptive, or misleading." Wis. Stat. § 100.18(1).

266.    CRH is a "person, firm, [or] corporation . . . with intent to sell, distribute, increase

the consumption of or in any wise dispose of any . . . . service." Wis. Stat. § 100.18(1).

267.     CRH made "statement[s] or representation[s] . . . to the public relating to" the health services it provided. Wis. Stat. § 100.18(1). Those statements contained "assertions, representations, and statemen[s] of fact" which were "untrue, deceptive, or misleading," *id.*, including, but not limited to, the following.

    a.  CRH claimed it would "maintain the privacy of [its patients'] personal health information (PHI)."[85]

    b.  CRH represented that it would only release its patients' Private Information for treatment, payment, and health care operations," as well as other limited, enumerated purposes, not including marketing.[86]

    c.  CRH stated that it would not sell or disclose to third parties for marketing purposes its patients' Private Information unless it had "obtain[ed the patient's] specific written authorization."[87]

268.     Had Plaintiffs and Class Members been aware that their Private Information would be transmitted to unauthorized third parties, they would not have entered into such transactions and would not have provided payment or their confidential information.

269.     Because Defendant fraudulently concealed the Disclosure of Plaintiffs' Private Information, consumers were deprived of the benefit of their bargain since the medical services and data security purchased were worth less than they would have been if those services had been provided without Disclosure of their Private Information.

---

[85] Exhibit B, Notice of Privacy Practices, CRH, https://res.cloudinary.com/dpmykpsih/image/upload/crossing-rivers-site-342/media/d98f995a44f14b05b014d3d2acb26b2c/noticeofprivacypractice_feb2020.pdf (last visited Nov. 30, 2023)
[86] *Id.*
[87] *Id.*

270.    As a direct and proximate result of Defendant's untrue, deceptive, and misleading statements, Plaintiffs and Class Members have suffered damages for which Defendant is liable.

271.    The DTPA provides that "[a]ny person suffering pecuniary loss because of a violation of this section by any other person may sue in any court of competent jurisdiction and shall recover such pecuniary loss, together with costs, including reasonable attorney fees." Wis. Stat. § 100.18(11)(b)2.

272.    Plaintiffs and Class Members seek damages for their pecuniary losses, plus interest on damages at the legal rate, as well as all other just and proper relief afforded by the DTPA, including reasonable attorneys' fees and costs and injunctive relief.

## COUNT X
## INTERCEPTION AND DISCLOSURE OF WIRE, ELECTRONIC, OR ORAL COMMUNICATIONS, WIS. STAT. § 968.31
### (On Behalf of Plaintiffs and the Class)

273.    Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

274.    "[W]hoever commits any of the following acts" violates Wisconsin's law against the interception and disclosure of wire, electronic, or oral communications.

(a) Intentionally intercepts, attempts to intercept or procures any other person to intercept or attempt to intercept, any wire, electronic or oral communication.

[ . . .]

(c) Discloses attempts to disclose, to any other person the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section.

(d) Uses, or attempts to use, the contents of any wire, electronic or oral communication, knowing or having reason to know that the information was obtained through the interception of a wire, electronic or oral communication in violation of this section or under circumstances constituting violation of this section.

275.     Under Wisconsin Statute § 968.27 "electronic communications" means "any transfer of signs, signals, writing, images, sounds, data or intelligence of any nature wholly or partially transmitted by a wire, radio, electromagnetic, photoelectronic or photooptical system."

276.     Plaintiffs' and Class Members' communications with Defendant using the Website and Online Platforms constitute "electronic communications" under Wisconsin Statute § 968.27.

277.     Defendant intentionally intercepted Plaintiffs' and Class Members' electronic communications for the purpose of disclosing those communications to unauthorized third parties, including Facebook and Google.

278.     Moreover, Defendant intentionally disclosed, or attempted to disclose, to Facebook, Google, and other persons the contents of Plaintiffs' and Class Members' electronic communications, with the knowledge the information was obtained through the interception of an electronic communication in violation of Wisconsin Statute § 968.31.

279.     Additionally, Defendant intentionally used, or attempted to use, the contents of Plaintiffs' and Class Members' electronic communications, with the knowledge that the information was obtained through the interception of an electronic communication in violation of Wisconsin Statute § 968.31.

280.     Defendant used and disclosing Plaintiffs' and Class Members' electronic communications, to Facebook, Google, and other third parties, for the purpose of committing criminal and tortious acts, including, but not limited to

    a.   criminal violation of 18 U.S.C. §§ 1343;

    b.   criminal violation of HIPAA, 42 U.S.C. § 1320d-6;

    c.   invasion of privacy under Wisconsin Statute § 995.50;

    d.   unauthorized use of an individual's personal identifying information or documents

under Wisconsin Statute § 943.201; and

e.   breach of confidentiality of patient health care records under violation of Wisconsin Statute § 146.82.

281.   Defendant's misconduct also falls within the ambit of Wisconsin's wiretapping statute because the disclosure of Plaintiffs' and Class Members' Private Information to third parties—without consent or proper authorization—is a tortious act that constitutes multiple torts under Wisconsin law, including the torts of conversion and breach of fiduciary duty.

282.   Defendant knew or had reason to know that its use of the Meta Pixel and other third-party trackers would cause Plaintiffs' and Class Members' computing devices to remove and redirect their data and the content of their communications with Defendant to third parties including Facebook and Google.

283.   Wisconsin Statute § 968.31(2m) provides that "[a]ny person whose wire, electronic or oral communication is intercepted, disclosed or used in violation of ss. 968.28 to 968.37 shall have a civil cause of action against any person who intercepts, discloses or uses, or procures any other person to intercept, disclose, or use, the communication."

284.   Plaintiff's and Class Members' electronic communications were intercepted during transmission, without their consent, for the unlawful and/or wrongful purpose of monetizing their Private Information, including using their sensitive medical information to develop marketing and advertising strategies. The Private Information that Defendant assisted Facebook, Google, and other third parties with reading, learning, and exploiting included Plaintiffs' and Class Members' identities, medical conditions, and information about their past, present, and future medical treatment.

285.   No legitimate purpose was served by Defendant's willful and intentional disclosure

of Plaintiffs' and Class Members' Private Information to third parties.

286.    Neither Plaintiffs nor Class Members consented to the disclosure of their Private

Information by Defendant to third parties. Nor could they have consented, given that Defendant

never sought Plaintiffs' or Class Members' consent, or even told visitors to its Website that their

every interaction was being recorded and transmitted to third parties.

287.    Under Wisconsin Statute § 968.31(2m), aggrieved persons are entitled to "[a]ctual

damages, but not less than liquidated damages computed at the rate of $100 a day for each day of

violation or $1,000, whichever is higher," "[p]unitive damages," and "[a] reasonable attorney's

fee and other litigation costs reasonably incurred."

288.    Defendant's unlawful interception of their electronic communications injured

Plaintiffs and Class Members in the following ways.

a.    Sensitive and confidential information that Plaintiffs and Class Members intended to remain private is no longer private;

b.    Defendant eroded the essential confidential nature of the doctor-patient relationship;

c.    Defendant took something of value from Plaintiffs and Class Members and derived benefit therefrom without Plaintiffs' and Class Members' knowledge or informed consent and without sharing the benefit of such value;

d.    Plaintiffs and Class Members did not get the full value of the medical services for which they paid, which included Defendant's duty to maintain confidentiality; and

e.    Defendant's actions diminished the value of Plaintiffs' and Class Members'

Private Information.

289.     Plaintiffs and Class Members also seek such other relief as the Court may deem equitable, legal, and proper.

## COUNT XI
### VIOLATION OF CONFIDENTIALITY OF PATIENT HEALTH CARE RECORDS LAW, WIS. STAT. § 146.82
#### (On Behalf of Plaintiffs and the Class)

290.     Plaintiffs re-allege and incorporate the above allegations as if fully set forth herein.

291.     Under Wisconsin law, all patient health care records must remain confidential and patient health care records may only be released to a person upon the informed consent of the patient or as otherwise authorized by the patient.

292.     Defendant disclosed the private and protected medical information of Plaintiffs and Class Members to unauthorized third parties without their knowledge, consent, or authorization.

293.     CRH is a healthcare provider as defined by Wisconsin Statute § 146.816(1).

294.     Plaintiffs and Class Members are patients, and, as their healthcare provider, Defendant had and has an ongoing obligation not to disclose their Private Information.

295.     The Private Information disclosed by Defendant is PHI as defined by Wisconsin Statute § 146.816(f).

296.     Defendant violated Wisconsin Statute § 146.81, through its willful and knowing failure to maintain and to preserve the confidentiality of the medical information of Plaintiffs and the Class Members.

297.     Defendant's conduct with respect to the disclosure of its patients' confidential Private Information was willful and knowing because it configured and implemented the digital platforms and tracking software that gave rise to sharing its users' Private Information (PII and

PHI) with third parties.

298.    Plaintiffs and Class Members were injured as a result of Defendant's violation of the confidentiality of patient health care law.

299.    As a result of its intentional and willful disclosure of Plaintiffs' and Class Members' Private Information, Defendant is liable for actual damages, additional damages of at least $25,000 if the violation was willful or $1,000 otherwise and the costs and attorneys' fees incurred as a result of the violation. *See* Wis. Sta. § 146.84.

**PRAYER FOR RELIEF**

**WHEREFORE**, Plaintiffs JANE DOE and JANE ROE, individually, and on behalf of all others similarly situated, prays for judgment as follows:

A.    for an Order certifying this action as a Class action and appointing Plaintiffs as Class Representative and Plaintiffs' counsel as Class Counsel;

B.    for an award of actual damages, compensatory damages, and statutory damages and penalties, in an amount to be determined, as allowable by law;

C.    for an award of punitive damages, as allowable by law;

D.    for equitable relief enjoining Defendant from engaging in the wrongful conduct complained of herein pertaining to the misuse and/or disclosure of Plaintiffs' and Class Members' Private Information and from refusing to issue prompt, complete and accurate disclosures to Plaintiffs and Class Members;

E.    for equitable relief compelling Defendant to utilize appropriate methods and policies with respect to consumer data collection, storage, and safety and to disclose with specificity the type of Private Information compromised and unlawfully disclosed to third parties;

F.      for equitable relief requiring restitution and disgorgement of the revenues wrongfully retained as a result of Defendant's wrongful conduct;

G.      an order Defendant to pay for not less than three years of credit monitoring services for Plaintiffs and the Class;

H.      for an award of attorneys' fees under the Wis. Stat. § 995.50, the DTPA, Wis. Stat. § 968.31, Wis. Stat. § 146.84, the common fund doctrine, and any other applicable law;

I.      costs and any other expenses, including expert witness fees incurred by Plaintiffs in connection with this action;

J.      pre- and post-judgment interest on any amounts awarded; and

K.      such other and further relief as this court may deem just and proper.

**JURY DEMAND**

Plaintiffs, by counsel, hereby demands a trial by jury on all issues so triable.

Dated: April 1, 2024            Respectfully submitted,

_/s/ Alex Phillips_
Alex Phillips, SBN 1098356
Samuel J. Strauss, SBN 1113942
Raina Borelli (*Pro Hac Vice* forthcoming)
TURKE & STRAUSS, LLP
613 Williamson St., Suite 201
Madison, Wisconsin 53703
(608) 237-1775
(608) 509-4423 (facsimile)
alexp@turkestrauss.com
sam@turkestrauss.com
raina@turkestrauss.com

Lynn A. Toops (*Pro Hac Vice* forthcoming)
Amina A. Thomas (*Pro Hac Vice* forthcoming)
Mary Kate Dugan (*Pro Hac Vice* forthcoming)
COHEN & MALAD, LLP
One Indiana Square, Suite 1400

Indianapolis, Indiana 46204
(317) 636-6481
ltoops@cohenandmalad.com
athomas@cohenandmalad.com
mdugan@cohenandmalad.com

J. Gerard Stranch, IV (*Pro Hac Vice* forthcoming)
Andrew E. Mize (*Pro Hac Vice* forthcoming)
STRANCH, JENNINGS & GARVEY, PLLC
The Freedom Center
223 Rosa L. Parks Avenue, Suite 200
Nashville, Tennessee 37203
(615) 254-8801
(615) 255-5419 (facsimile)
gstranch@stranchlaw.com
amize@stranchlaw.com

***Counsel for Plaintiffs and the Proposed Class***